## JILL MILLER, MSSW

Forensic Social Work Services

7818 Big Sky Drive, Suite 210B
Madison, Wisconsin 53719
(608) 833-6289
FAX (608) 833-5344

## RESUME

### CURRENT POSITION

**1984-present**    Forensic Social Work Services.  Private practice in forensic social work, providing consultation and expert witness services to attorneys and courts in criminal, juvenile, family and other civil proceedings.  Specializing in social history investigations and psycho-social assessments; the development of treatment and rehabilitation plans for sentencing and dispositional hearings; preparation for the penalty phase of capital murder cases; and analysis of penalty phase preparation and presentation in post-conviction capital cases.  Sole proprietorship; opened in January, 1984.  Previously engaged in limited private practice from 1973 to 1976, and 1978 to 1983.

### LICENSE

Licensed as an Independent Clinical Social Worker, State of Wisconsin, License Number 1662.

### EDUCATION

**1983**    Completed 20 hour training program on Mediation in Divorce and Family Disputes.

**1973-74**    Doctoral student, University of Wisconsin-Madison, School of Social Work. Emphasis on legal aspects of social work practice and welfare economics.

**1971**    Masters of Science Social Work, University of Wisconsin-Madison.  Field placements at Legal Services Center and Dane County Mental Health Center. Thesis research on attitudes of welfare recipients toward welfare rights organizations.  Recipient of HEW Social and Rehabilitation Services Training Grant.

**1967**    Bachelor of Arts Degree, major in Social Work, University of Wisconsin-Madison.  Recipient of UW-Madison tuition scholarship during all semesters

156

Page 2

| | |
|---|---|
| 1963-64 | Attended Carroll College, Waukesha, Wisconsin. Recipient of tuition scholarship as National Merit finalist |

## EMPLOYMENT HISTORY

1973-85      Clinical Assistant Professor, School of Social Work, University of Wisconsin-Madison. Taught courses in Social Work Advocacy and the Law, Social Work Methods, and Field Experience. Supervised field course units at the Wisconsin State Public Defender Office, Youth Policy and Law Center, Legal Services Center of Dane County, Dane County Juvenile Court, Wisconsin Indian Legal Services and Wisconsin Council on Criminal Justice. Areas of expertise included law and legal skills for social workers, advocacy, criminal and juvenile justice, and policy development.

1979-84      Client Services Director, Office of the State Public Defender, Wisconsin. Position entailed responsibility for the social work services of the statewide public defender system and other administrative responsibilities. Duties included development of positions, hiring, training, supervising, legislative monitoring, development of resource materials, consultation with trial offices throughout the state, development of student placements, and other duties as determined by the State Public Defender. Special assignments included: coordination of the representation of unaccompanied Cuban minors placed in Wisconsin after the Mariel boat-lift; conducting a study of the issue of recoupment from parents for the costs of legal representation of their minor children, and developing and directing a joint training program with the Division of Corrections on probation and parole revocation procedures. In addition, provided services to attorneys on selected cases.

1976-78      Associate Director, Youth Policy and Law Center, statewide public interest agency in Wisconsin. Agency involved child advocacy and policy reform in the state's juvenile justice system. Responsibilities included administrative duties, fund-raising, supervising intern program, personnel and affirmative action, and involvement in substantive issues. Special projects included state budget issues, detention practices, dispositional alternatives, correctional practices, mental health issues and legislative monitoring. Involved in the drafting and passage of a new state juvenile code. Co-founder of agency.

1975      Instructor, University of Wisconsin Extension course on Law and Social Work.

1974-75      Program Co-director of U.S. HEW-funded project on "Legal Training for Child Welfare Workers", sponsored by the University of Wisconsin Center for Social Services. Program involved workshops on legal aspects of substantive areas in child welfare field, production of eight videotape programs to be used

157

Page 3

as training tools in agencies, and production of training manual. Co-authored grant proposal.

1974        Instructor, University of Wisconsin Extension course on Law and Social Work

1973        Instructor, University of Wisconsin Extension course on Juvenile Justice

1971-73     Staff Social Worker, Legal Services Center of Dane County, Madison, Wisconsin.   Supervisor of social services in juvenile, criminal and civil programs of agency; caseload in Juvenile Defender Program; liason field instructor for graduate students of the University of Wisconsin-Madison School of Social Work.

1971-72     Staff, Emergency Mental Health Services. Twenty-four hour suicide and crisis intervention service operated by the Dane County Mental Health Center, Madison, Wisconsin. Part-time position.

1970-71     Teaching Assistant, School of Social Work, University of Wisconsin-Madison. Assisted in teaching of undergraduate field experience and social work methods course at the Dane County Department of Social Services.

1967-70     Undergraduate Counselor, School of Social Work, University of Wisconsin-Madison. Provided academic counseling to undergraduate students; prepared timetable of courses; assisted during registration; contributed to preparation of school bulletin; and performed other duties as required by the Director of the School of Social Work.

## PROFESSIONAL MEMBERSHIPS

1998 - present    The American Academy of Experts in Traumatic Stress; Board certified in Forensic Traumatology (January, 1999)

1995 - present    National Association of Sentencing Advocates; member of Policy Committee and Mitigation committee; co-ordinator of mentor project

1992 - 2000       National Organization of Forensic Social Work; also a member from 1986 to 1989; Elected member of Board of Directors (1993 - 1996); Secretary of Board of Directors (1995 - 1996)

1980 - present    National Legal Aid & Defender Association.  Elected member of Defender Council (1993 - 1998, and 1983 - 1990); elected member of Board of Directors (1986 - 1990);   chairperson of Social Services Section and co-chairperson of Death Penalty Litigation Section; founder of Social Services Section; Chairperson of Defender Council (1996 - 1998); past member of

158

Page 4

Executive Committee, Conference and Awards Committee, Membership Committee, and Nominating and Resolutions Committee at various times.

## AWARDS

2000      Recipient of "Life in the Balance" Achievement Award, presented annually by the National Legal Aid & Defender Association in recognition of contributions to capital defense representation

1999      Recipient of award for "Outstanding Contributions to the Profession", annual award by the National Association of Sentencing Advocates, for dedication in the advancement of sentencing advocacy

## PROFESSIONAL SERVICES

1997      Appointed member of Working Group for the U.S. Department of Justice, Bureau of Justice Assistance and Bureau of Justice Statistics co-sponsored national study of indigent defense systems, which met in Washington, D.C. in March, 1997.

1995-96      Member of Blue Ribbon Advisory Committee appointed by the National Legal Aid & Defender Association under a grant from the U.S. Department of Justice, Bureau of Justice Assistance. Committee composed of experienced academics and practitioners who were knowledgeable about the criminal justice system, particularly the defense function. Purposes of the committee were to identify successful models of indigent defense programs, alternative initiatives crucial to the improvement of the criminal justice system, and areas of indigent defense representation that required further research and development.

1993-96      Board Member, Consortium for the National Equal Justice Library.
1990-92      Consultant, National Legal Aid & Defender Association, for Mitigation Specialists Training Project and Mitigation Affidavit Project.

1991      Consultant to the Missouri State Public Defender System; provided training for mitigation investigation staff.

1990-91      Consultant to the Illinois Capital Resource Center, provided two sixteen-hour training programs for mitigation staff.

159

Page 5

| | |
|---|---|
| 1986-89 | Consultant, Project FIT (Families in Transition), an intensive in-home treatment program for adolescents and their families, operated by Family Services, Madison, Wisconsin |
| 1988 | Consultant to State of Florida, Department of Health and Rehabilitation Services. Prepared training monograph for state juvenile court workers titled "The Social Worker in Court: Case Preparation and Testifying." |
| 1983-89 | Task Force on Women in the Criminal Justice System, Wisconsin Women's Network. Member and legislative coordinator. |
| 1979-86 | Mental Health Association in Wisconsin. Member, Board of Directors; chairperson of the Public Policy Committee and the Child Advocacy Committee; treasurer. |
| 1983-84 | Judicial Council, State of Wisconsin, General Projects Committee. Represented the Office of the State Public Defender at meetings to study the issue of recoupment from parents for the costs of legal representation of their children and appellate procedures in state courts. |
| 1978-84 | Project TRY Advisory Committee. TRY (Treatment and Rehabilitation for Youth) was an intense treatment program for delinquent children in need of mental health treatment in a secure setting. |
| 1981-82 | Committee on Revision of Administrative Rules Governing Child Welfare Institutions. Appointed by Secretary of the Wisconsin Department of Health and Social Services. |
| 1980-82 | Consultant, ABT Associates, private consulting firm in Cambridge, Massachusetts. Consulted on federally-funded project to develop program model materials on social services in public defender offices. |
| 1980 | Consultant, to Briarpatch (runaway center in Madison, Wisconsin) on the development of a group home for Cuban juveniles. |
| | Consultant to University of Kentucky School of Social Work on the development of social work field placements in legal settings. |
| 1978-79 | Consultant and Research Associate, Youth Policy and Law Center. |
| 1979 | Foster Care Monitoring Project, Advisory Committee, joint project of the Wisconsin Department of Health and Social Services and the University of Wisconsin-Milwaukee. |

160

Page 6

Consultant to research project on issues in mental health, conducted by Dr. Dave Gustafson, Center for Health Sciences, University of Wisconsin

1977-79 Juvenile Grievance Procedure Implementation Committee, state committee appointed by Wisconsin Division of Corrections to implement a grievance mechanism in juvenile correctional programs.

1976-79 Law-Related Education Advisory Committee, committee established to oversee project co-sponsored by Wisconsin Department of Public Instruction and State Bar of Wisconsin, to establish law-related education in the state's secondary and middle schools.

1975-79 Wisconsin Civil Liberties Union, Children's Rights Committee.

1977-78 Juvenile Detention Implementation Committee, co-chairperson. State committee established by the Wisconsin Department of Health and Social Services to implement the recommendations of the Juvenile Detention Study.

Juvenile Grievance Procedure Committee. State committee appointed by the Wisconsin Division of Corrections to study the need for a grievance procedure in juvenile correctional programs and to establish guidelines for the development of a procedure.

Prison Health Care Advisory Committee. State committee appointed by the Wisconsin Department of Health and Social Services to study and make recommendations on health care programs in adult and juvenile correctional facilities.

Title XX Advisory Committee. Committee appointed by the Wisconsin Department of Health and Social Services to develop Title XX plan for the state.

1975-76 Joint Legislative Committee on Institutional Closings. Committee mandated and appointed by the Wisconsin Legislature to study the closing of the Wisconsin School for Girls and the Wisconsin Child Center, and to develop plans for alternate placements of the juveniles.

1972-75 Board of Directors, Briarpatch; Madison, Wisconsin agency serving runaway youths and their families.

1972-73 Consultant to Jonah House, a group home for emotionally disturbed adolescents in Madison, Wisconsin.

161

Page 7

## TRAINING, WORKSHOPS AND SPEECHES

2002 — Faculty, "Life in the Balance XIV", annual death penalty conference spnsored by the National Legal Aid and Defender Association; Kansas City, Mo.

2001 — Faculty, "Life in the Balance XIII", annual death penalty conference sponsored by the National Legal Aid and Defender Association; Albuquerque, New Mexico

Faculty, Death Penalty Seminar: Military Cases, sponsored by the Naval Justice School; Newport, Rhode Island

2000 — Faculty, "Making the Case for Life IV: Mitigation Investigation in Capital Cases", sponsored by the National Association of Criminal Defense Lawyers; Houston, Texas

Trainer, "Death Penalty Defense Workshop", sponsored by the Office of the State Appellate Defender - Death Penalty Trial Assistance Division; Chicago, Illinois

Faculty, "Life in the Balance XII", annual death penalty conference sponsored by the National Legal Aid and Defender Association; Washington, D.C.

Faculty, Annual Conference of the National Association of Sentencing Advocates; San Diego, California; also, co-coordinator and faculty, Death Penalty Institute, held in conjunction with annual conference

1999 — Faculty, "Making the Case for Life: Mitigation Investigation in Capital Cases", sponsored by the National Association of Criminal Defense Lawyers; Boise, Idaho

Faculty, Death Penalty Training Seminar, sponsored by the Florida Association of Criminal Defense Lawyers; Haines City, Florida

Faculty, Annual Conference of the National Association of Sentencing Advocates; Miami, Florida

Faculty, "Life in the Balance XI", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Atlanta, Georgia

1998 — Faculty, "The Fight for Life: Mitigation That Wins", sponsored by the Tennessee Association of Criminal Defense Lawyers and The Tennessee District Public Defenders Conference; Nashville.

162

Page 8

Trainer, Annual Conference of the National Association of Sentencing Advocates; Washington, D.C..

Faculty, "Life in the Balance X", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Philadelphia, Pennsylvania.

Faculty, "Making the Case for Life: Mitigation Investigation in Capital Cases", sponsored by the National Association of Criminal Defense Lawyers; Scottsdale, Arizona.

Trainer, Death Penalty Seminar sponsored by the Federal Defender Office of Washington & Idaho; Boise, Idaho

1997     Trainer, Annual Conference of the National Legal Aid & Defender Association; St. Louis, Missouri.

Trainer, Annual Conference of the New Mexico Public Defender; Glorietta, New Mexico.

Trainer, Nebraska Commission on Public Advocacy; presented day-long training program on mitigation in capital cases for staff of the Major Case Resource Center; Lincoln, Nebraska.

Faculty, "Life in the Balance IX", annual death penalty conference sponsored by the National Legal Aid & Defender Association.

1996     Trainer, Annual Conference of the National Legal Aid & Defender Association; Las Vegas, Nevada.
Faculty, "Understanding Violence: Prevention Strategies and Mitigation Training", seminar sponsored by the Center for Death Penalty Litigation, the Carolina Justice Policy Center, and the UNC-Chapel Hill School of Social Work; Chapel Hill, North Carolina.

Faculty, "Life in the Balance VIII", annual death penalty conference sponsored by the National Legal Aid & Defender Association; St. Louis, Missouri.

Trainer, Client Services Workshop, Office of the State Public Defender; Madison, Wisconsin.

1995     Trainer, Annual Conference of the National Legal Aid & Defender Association; New Orleans, Louisiana.

Trainer, Indiana Public Defender Council, Sentencing Training; Indianapolis, Indiana.

163

Page 9

Trainer, "The Defense of Drug Cases", National Legal Aid & Defender Association regional conference; Baltimore, Maryland.

Trainer, Annual Conference of the National Association of Sentencing Advocates; Chicago, Illinois.

Trainer, Annual Conference of the National Organization of Forensic Social Work; Reno, Nevada.

Faculty, "Life in the Balance VII", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Kansas City, Missouri.

1994   Trainer, Annual Conference of the National Legal Aid & Defender Association; Washington, D.C..

Speaker, University of Wisconsin-Madison Law School, course on Capital Punishment.

Trainer, NAACP Legal Defense and Education Fund; annual Capital Punishment Conference; Warrenton, Virginia.

Trainer, Annual Conference of the National Organization of Forensic Social Work; Atlanta, Georgia.

Faculty, "Life in the Balance VI", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Austin, Texas.

1993   Trainer, Annual Conference of the National Legal Aid & Defender Association; Albuquerque, New Mexico.

Trainer, Defender Association of Philadelphia; day-long training for homicide unit; Philadelphia, Pennsylvania; April, 1993.

Faculty, "Life in the Balance V", annual death penalty conference sponsored by the National Legal Aid & Defender Association; New Orleans, Louisiana; March, 1993.

1992   Trainer, Annual Conference of the National Legal Aid & Defender Association; Toronto, Ontario, Canada; October, 1993.

Trainer, Criminal Defense Conference, the Wisconsin State Public Defender; Oconomowoc, Wisconsin; October, 1992.

164

Page 10

Faculty, Death Penalty Seminar, sponsored by the Indiana Public Defender Council; Indianapolis, Indiana.

1991

Trainer, Annual Conference of the National Legal Aid & Defender Association; Portland, Oregon.

Faculty, "Mitigation Specialists Training", sponsored by the National Legal Aid & Defender Association, the Missouri Capital Punishment Resource Center, and the National Association of Social Workers - Missouri Chapter; St. Louis, Missouri.

Faculty, "Life in the Balance III", annual death penalty conference sponsored by the National Legal Aid & Defender Association; New Orleans, Louisiana.

Trainer, Annual Conference of the National Organization of Forensic Social Work; Washington, D.C.

1990

Trainer, Annual Conference of the National Legal Aid & Defender Association; Pittsburg, Pennsylvania.

1989

Trainer, Annual Death Penalty Seminar, sponsored by the Office of the State Appellate Defender; Collinsville, Illinois.

1988

Trainer, Annual Conference of the National Legal Aid & Defender Association; San Diego, California.

1987

Trainer, "Critical Issues in Juvenile Justice: A Working Conference", sponsored by the Wisconsin Department of Health and Social Services; Madison, Wisconsin.

Trainer, Annual Death Penalty Seminar, sponsored by the Office of the State Appellate Defender; Chicago, Illinois.

Trainer, "All About Families Conference", sponsored by the Wisconsin Child Advocacy Project; Madison, Wisconsin.

1986

Trainer, Annual Conference of the National Legal Aid & Defender Association; Atlanta, Georgia.

Speaker, Milwaukee Young Lawyers Association.

Trainer, Regional Conference of the National Defender Investigator Association; Madison, Wisconsin.

Page 11

Trainer, Annual Conference of the Office of the State Public Defender; Milwaukee, Wisconsin.

Speaker, Criminal Law Section of the Dane County Bar Association; Madison, Wisconsin.

1985      Trainer, Annual Conference of the National Legal Aid & Defender Association; also, coordinator of day-long training program for social services personnel in defender offices and private practitioners providing sentencing services to attorneys; Washington, D.C.

Trainer, Annual Conference of the Office of the State Public Defender; Milwaukee, Wisconsin.

Speaker, University of Wisconsin-Madison School of Social Work, Spring Symposium; Madison, Wisconsin.

1984      Trainer, American Bar Association, Annual Program Meeting; Chicago, Illinois.

Trainer, Annual Conference of the Office of the State Public Defender; Milwaukee, Wisconsin.

Trainer, Jefferson County Human Services Department and county law enforcement personnel.

Trainer, Eau Claire, Wisconsin region of Social Services Departments; Eau Claire, Wisconsin.

Speaker, Criminal Law Section of the Dane County Bar Association; Madison, Wisconsin.

1982      Trainer, Annual Conference of the National Legal Aid & Defender Association; Boston, Massachusetts.

1981      Trainer, Annual Conference of the National Legal Aid & Defender Association; San Francisco, California.

Faculty, Annual Conference of the Office of the State Public Defender; Madison, Wisconsin.

Trainer, First Annual Juvenile Court Intake Training Seminar, sponsored by the Wisconsin Juvenile Court Intake Association; Madison, Wisconsin.

166

Page 12

Trainer and coordinator; Client Services Spring Workshop, Office of the State Public Defender; Madison, Wisconsin.

1973-80    Trainer and speaker at numerous programs in Wisconsin on Legal Skills for Social Work, Sentencing, Child Advocacy, Mental Health, Juvenile Justice, and Child Abuse and Neglect.

## PUBLICATIONS, PROFESSIONAL PAPERS & MEDIA PRODUCTIONS

1991-96    Contributed several newsletter articles to "Capital Report", newsletter of the Death Penalty Litigation Section of the National Legal Aid & Defender Association; articles covered various topics relating to the death penalty and mitigation, including articles on mentally retarded capital defendants, Fetal Alcohol Syndrome and Effects, and cultural and environmental mitigation; several articles have been reprinted in newsletters published by state defender programs, resource centers, and criminal defense attorney associations.

1981-82    Developed a series of videotape programs on "Probation and Parole Revocation Procedures in Wisconsin", as part of the Joint Training Program on Probation and Parole Revocation Procedures, funded by the National Institute on Corrections. Directed the development of the training manual to be used in conjunction with the tapes; authored the grant proposal.

1980    Paper presented before the 1980 Program Meeting of the Council on Social Work Education, on "The Social Worker as Client Advocate: Teaching Advocacy in a Legal Setting"; Los Angeles, California.

1979    Article published in the Journal of Education for Social Work (Fall, 1980), titled "Teaching Law and Legal Skills to Social Workers"; also presented as a paper before the 1979 Annual Program Meeting of the Council on Social Work Education; Boston, Massachusetts.

1978    Paper prevented to the Prison Health Care Advisory Committee, state of Wisconsin, title "Health Care Needs in Juvenile Correctional Facilities."

1977    "Children in Jail and Detention", report to Acting Governor Martin Schreiber, state of Wisconsin, on the need for non-secure temporary care alternatives for juveniles.

1974    Developed and produced a series of eight videotape programs titled "Legal Training for Child Welfare Workers", used as training aids in social service agencies and social work classes; wrote grant proposal for development of training program, videotapes, and training manual; co-directors of program.

167

Page 13

## RESEARCH

1980-81              "Study of Recoupment From Parents for Costs of Legal Representation for
                     Their Children", study mandated by the Wisconsin Legislature in Capter 356,
                     Laws of 1979.    Study included analyzing statutes from other states on
                     recoupment and parental responsibility for costs of legal representation of their
                     children; surveying policies and practices in a number of public defender
                     systems in the country; researching case law on the issue; and conducting a
                     survey of parents of juvenile clients regarding their ability to pay and attitudes
                     towards recoupment.    Resulted in leglslative provision for recoupment in
                     Chapter 20, laws of 1981.

1977-78              Conducted study of all juveniles present in Wisconsin juvenile correctional
                     institutions on June 30, 1977.   Variables included age, sex, race, county of
                     residence, committing offense(s), prior offense history, prior services and
                     placements, history of running away from placement, and recommendations of
                     Juvenile Offender Review Board.   Data was used by state officials for future
                     planning of juvenile correctional programs.

## GRANTS

1973-1982            Authored or co-authored grant proposals resulting in over $550,000 in grant
                     awards for various projects, including for: the establishment of the Youth
                     Policy and Law Center, a statewide public interest agency involved in juvenile
                     justice policy issues in Wisconsin; a staff social worker position at the Legal
                     Services Center of Dane County, in Madison, Wisconsin; a joint training
                     program on probation and parole revocation procedures for the Department
                     of Corrections and the Office of the State Public Defender; a project to train
                     child welfare workers in the state of Wisconsin on law and legal skills; projects
                     for the representation and resettlement of unaccompanied Cuban minors in
                     Wisconsin; and a project to provide special services to indigent minority and
                     veteran defendants through the Office of the State Public Defender.

## OTHER ACTIVITIES

                     Testified before committees of the Wisconsin legislature on numerous
                     occasions since 1976 on issues related to juvenile justice, mental health, and
                     state funding for human services.

168

Page 14

Served on oral examining boards for state and county positions in Wisconsin approximately twelve times since 1975.

Participated in the drafting and passage of several pieces of legislation in Wisconsin, including the Children' Code revision (1978), the Mental Health Act, bills related to the criminal justice and human services systems, and state budget proposals.

Guest speaker on numerous occasions in classes at the University of Wisconsin-Madison.

Along with husband, own and operate a Christmas tree farm in western Wisconsin.

06, 2001

169

Exhibit 15

Declaration of Betty Hall

170

## DECLARATION OF BETTY HALL

Betty Hall, pursuant to the provisions of 28 U.S.C. § 1746, makes the following declaration:

1. I am the mother of Orlando Cordia Hall. I currently reside at 1210 North Miles Street, El Dorado, Arkansas 71730. I have personal knowledge of the facts set forth herein.

2. I was born in Shreveport, LA on February 22, 1944, and grew up in a little town called Colquitt, LA. When I married my first husband, Rev. Raymond Palmer, I moved to Smackover, Arkansas, where we lived for three years. Rev. Palmer and I separated when I was about six months pregnant with my oldest child, Pam Palmer, and were divorced about three months after her birth. Pam was born November 1, 1964. I began seeing Alvin James Hall ("A.J.") when Pam was an infant. When Pam was around six months old, we moved into A.J.'s home in El Dorado, Arkansas. A.J. and I married a few months later. A.J. Hall and I have five children together: Cassandra Ross (who is thirty-three years old); Scotty Hall (thirty-two years old); Orlando Hall (twenty-nine years old); Tracy Hall (twenty-seven years old); and Demetrius Hall (twenty-four years old). A.J. has five additional children with other women.

3. Prior to Orlando's death penalty trial, I had very little contact with the lawyers who were defending Orlando in the case or with any other people on the defense team. I remember meeting a woman investigator named Tena Francis; one of Orlando's trial attorneys, Michael Ware; and a young man who was assisting Mr. Ware whose name I do not recall. I saw Orlando's other trial lawyer, Jeff Kearney, only when I was in the courtroom for the purpose of testifying during the trial.

1

4. I believe that I met with Tena Francis two or three times in El Dorado, Arkansas. She came out to my house and talked with me for a few hours each time. I do not recall specifically when these meetings were, but I think they took place not long before Orlando's trial in the fall of 1995. Tena asked me about a lot of things that I had never talked to anyone about. She wanted to know what things were like for Orlando when he was growing up. In particular, she asked about the physical abuse that I suffered at the hands of my husband A.J. Hall and the effect this violence had upon me and my children. At first, it was very difficult for me to talk about these things with her at all. There are a lot of things you are so ashamed of you don't want to talk about them with anyone. After a time, I was able to talk a little about some of these things, but not in much detail. During my meetings with Tena, I certainly did not tell her about a lot that happened to me and my children because I was not able to discuss these painful events. Even now, it is very difficult for me to talk about my life with A.J. Although I have come to be able to address the violence in my home more freely, there are still things that are locked up inside me that I am not able to talk about.

5. Although I saw Tena again when I was in Ft. Worth for the trial, she was in and out a lot and we did not have any detailed conversations.

6. I believe that I met with Orlando's attorney, Michael Ware, on one occasion in El Dorado when he came to see me where I worked at the Con Agra Poultry Plant. I recall that he was accompanied by a young male assistant and think this meeting occurred when jury selection was already proceeding in Orlando's case. Mr. Ware and his assistant met with me for about an hour in an office room at Con Agra. They talked about Orlando and my youngest son, Demetrius, and the crime they were accused of. Mr. Ware wanted to know if I knew anything about the case and if I

2

thought that Orlando was guilty. I told him that the only things I knew came from the news reports I had seen. Mr. Ware did not discuss my family or Orlando's upbringing. I believe this was the only meeting I had in Arkansas with Orlando's trial attorneys.

7. I went to the Dallas/Ft. Worth area for about two weeks during the trial. While there, I think that I met with Mr. Ware, on two occasions. I recall one meeting at Mr. Ware's office, which was attended by me, A.J. Hall and my daughter, Cassandra Ross. It lasted about one to two hours and mostly concerned questions about the trial that Cassandra had for Mr. Ware. Mr. Ware said that he would probably put me on the stand, but he did not tell me what he would ask me about or what would happen when I was cross examined by the government. When A.J. was in another room, we briefly discussed A.J.'s beating me, but my recollection is that I brought up the subject.

8. I also vaguely recall meeting with a psychiatrist in Dallas. Cassandra and I went to the meeting together, but I was questioned privately. The doctor wanted to know a little about Orlando's childhood and the abuse in my marriage. I know that the interview was not very in-depth because I remember remaining calm throughout the interview. If I had discussed any of the intimate and painful details of my marriage, I know that I would have become very emotionally upset. I think the meeting lasted about an hour and that it took place a few days before I testified at the trial.

9. I did not actually learn that I was to testify until the same day I testified, shortly before I was called to the stand. During a break, Mr. Ware pulled me aside in the hallway and spoke with me briefly. He told me that he was going to put me on the stand and that he would ask me about my and A.J.'s relationship. He also told me just to answer the questions that the government's attorneys asked me as best I could, but didn't tell me what they would ask.

3

10. I was completely unprepared to testify when I was called to the witness stand in the penalty phase. No one had gone over my testimony with me or told me about how the process worked. I had not even seen how things proceeded because I was not allowed in the courtroom during the trial except when I testified. I certainly was not prepared to answer questions being asked by a lawyer I hardly knew concerning intimate and embarrassing details of my life in front of a group of people I had never seen before. As a result, I hardly told the jury anything about Orlando or his life, even though I know a lot of information that I believe would have been helpful to the jury in understanding my son and reaching a decision about his sentence..

11. There were other people, such as Rev. D.L. Hegler and Rev. Willie Ray Norful and his wife, who came from Arkansas for the trial. These people knew Orlando well and were aware of the situation in our family. They could have testified about these matters, but were never called to the stand by Orlando's attorneys even though they were waiting out in the courthouse hallway with the rest of us during the penalty phase.

12. After Orlando was sentenced to death, he got a new attorney, Marcia Widder, for his appeal. I came to know Ms. Widder in many phone conversations during the appeal and afterwards, and over the course of time have developed feelings of trust in her because she has always explained what was going on in Orlando's case and has been very supportive. I also know that my son, Orlando, has a great deal of trust in her.

13. In April of this year, Ms. Widder came to El Dorado to meet with me and other people in the community. She visited me in my home several times and once at work. On one occasion, her co-counsel in Orlando's case, Rob Owen, came to meet with me as well. During these visits, I told Ms. Widder and Mr. Owen about some of the things that happened to me during my marriage

4

174

to A.J. Hall. A lot of what we discussed were things that I had not told any of the people working on Orlando's case previously because I was unable to talk about these matters. Even though I felt comfortable talking to Ms. Widder and Mr. Owen, it was very difficult for me and there are many things that I still have not been able to tell them. The things I talked about are set forth below.

14. I hate the day I met A.J. Hall. My marriage was full of misery because that man beat me routinely, even when I was pregnant. Although there were many times when I should have gone to the hospital, I think that I only went to the hospital twice because A.J. wouldn't let me go. Once I was taken to the hospital by ambulance and another time I was either taken or accompanied by my niece Robbie Charles. The time that I was taken to the hospital by ambulance, the police arrested A.J. and took him to jail. His brother T.J. bailed him out and he came right back to our house.

15. A.J. would abuse me when he was drinking. I think he was jealous of my attractiveness and the age difference between us, because he was 16 years older. I also think he was jealous because I made more money than him at my job at Con Agra. A.J. always wanted to brutalize my face when he beat me. I think he was trying to disfigure me. If he thought I had done something, he was ready to knock me out. It wasn't anything I was doing — I was working all the time.

16. A.J. would get upset with me if I did anything different from the routine he imposed. He'd want me to get home at the same time every day and if I didn't get home on time, he'd accuse me of doing something and beat me up. I couldn't always get off work at the same time and would be in a panic, trying to get home on time for A.J. I'd run red lights and almost run over people, because I knew what would happen if I was five or ten minutes later than yesterday. There was no explaining to A.J. why I was late. It was his way or no way. I'd just get out of work like a bat out of hell because I couldn't waste any time. I remember times I drove up and he knocked me off the

5

175

porch because I was ten minutes late. I went through that for years.

17. There were times the police came to our house. They came every time I called, I think about five or six times. It was never the same officers. The police would talk to me about what happened and tell me to go to the prosecutor and press charges. But I couldn't press charges and live there. Why would I do something that would jeopardize me even more? We'd all end up back there together and A.J. would be even madder than before. I may have pressed charges the one time he went to jail. Another time the police took him outside and threatened him. It seems like another time the police came, but I didn't talk to them because I was in the back and couldn't talk because I was hurting too bad. I probably should have; I had two black eyes.

18. I recall that A.J. hit me with a 2"X 4" when Cassandra was about two or three and I was pregnant with Orlando. A.J. hit me on the top of the back of my head and I had to go to the hospital. A.J. had been drinking at the time and was jealous about something.

19. Another time, AJ threw me through a picture window in our house; he hit and shoved me through the window. He was drunk and full of it. He didn't have to be mad about anything I had done. He'd just get to drinking and go crazy; all he wanted to do was just fight.

20. On another occasion, I had gone to the grocery store with Demetrius. On the way home, a car pulled out in front of us and there was almost a wreck. When Demetrius and I got home, we lay on the floor watching TV. A.J. was sitting there drinking. I made some remark to Demetrius about my blood pressure going up from the scare of almost getting into an accident. A.J. heard the remark and must have thought that I said something else. He jumped on me and nearly beat me to death. One of the kids managed to get out of the house and called the police. I don't know if it was Cassandra, Orlando or Tracy. I know that Scotty was already in the service at this time. The police

6

176

came and manhandled A.J. and threatened him, but they didn't take him to jail.

21. I have scar tissue on the side of my nose where A.J. beat me with a gun. I didn't go to the hospital for that. There are lumps on the back of my head from beatings. There were many times I feared for my life when A.J. was beating me. My daddy told me before he died that A.J. would be the death of me.

22. I went to the hospital several times because I had such bad headaches. I doubt I told the doctors about the abuse I got at home even though I think the beatings to my head caused my headaches. Back then people didn't talk about such things and it was safer not to. The police would have gotten involved but nothing really would have been done about it. I would have gone home and it would have just started up again.

23. My children would see a lot of the violence in the house. When they were little, there wasn't anything they could do. When Scotty, the oldest boy, got big enough, he told A.J. he would kill him if he hurt me. In response, AJ would threaten to kill Scotty. I was relieved when Scotty decided to leave home right after high school and join the service, because I was sure that if he stayed, one of them was going to end up killing the other.

24. The neighbors knew about the abuse as well. Sometimes fights would spill out into the street. I recall there were times when I tried to get away from A.J. in the car. He would jump on the hood and try to stop me. I would try to throw him off. I wanted to break his head. There was one time I dragged him alongside the car. He had got in the door and grabbed the wheel. When I drove off anyway, he let go.

25. There were days I went to work when I was beat up so bad the supervisor sent me home.

7

26. After beatings, AJ would act like he hadn't done nothing. He would want to go to bed and have sex and I had to act like I wanted it too. If I just lay there, he would beat me. I had to take a lot of this. That is the awfulest thing I had to do in my life, to have sex after I'd just been beaten like a dog and kicked in my privates. So many times I just wanted to die.

27. I stayed in the marriage because I had six young children and no place to go. I told myself that when Demetrius was old enough, I would get out. I remember that I was at work one day and all of these bad feelings about my marriage welled up in me. I asked for permission to leave work, and went home and packed up everything. The next day, I rented an apartment, borrowed a truck, and moved myself and my children to a house on El Dorado Avenue.

28. After I moved out of the house, I filed for divorce and found out that I had never even been married to that man. When A.J. married me, he still hadn't divorced his previous wife, Geraldine Hall, so all my miserable years with him were nothing but a lie.

29. A.J. was the meanest man I ever saw in my life — he'd rather beat a woman than look at her. He was like that with any woman he had. I know from talking to other women he was with that he beat the daylights out of all of them. Vera Merchant, who was the mother of A.J.'s sons Keith and Paul, was all scarred up from him beating her. I remember that early on in my marriage to A.J., he hid out in Vera's apartment when she went out with another man and attacked her when she came home. He beat her and, when she threw up her hands to protect herself, nearly cut off her finger with a knife. She called me the next morning and told me that my husband had cut her. When I confronted A.J. about it, he beat me and then left the house.

30. It has been extremely difficult for me to discuss these matters with Orlando's current attorneys because I have tried for so many years not to think about these things. The day after Ms.

8

Widder first began talking with me about my marriage, my blood pressure went sky high and I had to see my doctor. I also started having problems sleeping because my dreams were disturbing me. I can only talk about my marriage in little bits. Then I have to sit and not talk for a while to calm myself down. I know it takes a lot of patience and understanding to work with me on getting this information.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ⎽5- 8 -⎽2000⎽ (date).

_Betty Hall_
BETTY HALL

P.S. As far as I can See everything is just like I Said, & correct.

BH.

9

Exhibit 16

Declaration of Cassandra Ross

180

## DECLARATION OF CASSANDRA ROSS

Cassandra Ross, pursuant to the provisions of 28 U.S.C. § 1746, makes the following declaration:

1. I am one of Orlando Hall's sisters. I currently reside at 5671 High Creek Drive, Dallas, TX 75249. I have personal knowledge of the facts set forth herein.

2. I was born in El Dorado, Arkansas on December 9, 1966, and grew up there. I left El Dorado when I was eighteen or nineteen and have lived in Texas ever since. I am the oldest of the five children born to Betty Hall and Alvin James ("A.J.") Hall. I have an older half-sister, Pam Palmer, who is my mother's daughter from a previous marriage and who grew up with us. My father has five additional children with other women.

3. I had very little contact with Orlando's lawyers or with any other people working on his defense prior to Orlando's death penalty trial. I remember meeting a woman investigator named Tena Francis once in my home and recall one or two meetings with one of Orlando's trial attorneys, Michael Ware, sometime during the fall of 1995. I do not think I ever talked to Orlando's other trial lawyer, Jeff Kearney, and only saw him when I was in the courtroom for the purpose of testifying during the trial. I know that I tried to call Mr. Ware on the telephone several times before the trial, but he didn't return my phone calls.

4. I believe that Tena Francis came to my home in Grand Prairie, Texas on one occasion. She met with me for about an hour or an hour and a half. I recall the trial coming up really quickly after that. Ms. Francis wanted to talk to me about the situation in my home growing up and my father's physical and emotional abuse of my mother. These are things that I have tried to put behind me for a long time. That day, I was not able to discuss my childhood in much detail because my

1

memories of my parents' violent relationship are so painful to me and I try not to think about them. Moreover, this crime turned my life upside down. The publicity surrounding the case subjected us to such hostility that my husband and I moved from Irving to Grand Prairie, and also sent our son Marco back to live with Jerry's parents for the rest of the school year. All these factors made it even harder for me to talk about our experiences growing up. I had the impression when Ms. Francis left that she planned to follow up with another visit with me, but that never happened. I did see her running about at the courthouse during Orlando's trial, but we never had the opportunity to talk extensively about my childhood or Orlando.

5. I recall taking my parents and Orlando's young daughter, TeAushia, to Mr. Ware's office for a meeting. I do not remember exactly when this was, but believe it was some time during the trial. At the meeting, we all sat around a table. Mr. Ware wanted to know what we knew about Marvin Holloway and Bruce Webster. He also asked about LaTonya Anders and her actions at the time of the kidnapping. (I was surprised to learn that LaTonya was going to be a witness for the government because she had continued to visit with my family frequently after Orlando's arrest and we were working at the same place at the time.) At this meeting, I do not recall Mr. Ware asking us questions about our family life.

6. I do not recall ever talking to Mr. Ware about the abuse in my family until he spoke with me briefly in the courthouse on the day I testified. I know that if I had had any meaningful conversations with him about my family I would remember it. That is because if I really talk about the situation in my family when I was a child, I get very upset, and I don't recall being upset when I talked to Mr. Ware.

7. I did not know that I would be called to testify until the day that I was put on the stand.

2

182

Mr. Ware pulled me and my mother aside in the courthouse hallway. Mr. Ware told us he needed my mother to testify about her marriage to A.J. and he needed me to testify about my childhood. He told us that he was having my father taken across the street. I recall that someone did take A.J. across the street, but he didn't want to go.

8. No one had prepared me to testify before I took the stand. I was thus ill-equipped to talk on the witness stand about the dynamics in my family or how the violence in my childhood home affected me and my siblings. I felt that my testimony did not convey what really happened to me and my brothers and sister when we were growing up because I was asked questions in such a way that I didn't know how to respond. I was also utterly unprepared to answer the prosecutor's question about why I turned out okay even though I grew up in the same household as Orlando.

9. I feel that I would have been able to talk about my upbringing and the effect that the violence between my parents had on all of the children if I had been prepared by Orlando's attorneys to talk about these matters. There are many things that I could have told the jury to explain who Orlando is and what his childhood and adolescence was like. I know that talking to me about my parents' abusive relationship before the trial would have helped me to discuss it in court because I have come to be able to discuss what happened in my childhood much more freely with Orlando's current attorneys.

10. My parents relationship was extremely violent for as long as I can remember and they fought a lot. If it wasn't every weekend, it was every other weekend. I think my mother was beaten at least three times a month for a long as she was with my father. Even though he is my father and I respect him for that, A.J. is a total monster as far as I'm concerned.

11. I recall my mother being beaten with a 2" X 4" and going to the hospital. Once, A.J.

3

183

threw her through a window. Even though she was hurt and bleeding, she didn't go to the hospital for that. I recall them going at each other with hammers. When I was twelve, A.J. chased my mother through the streets trying to hurt her. Everyone in our neighborhood knew about the violence in my family. I remember as children we would sometimes be awakened by bumps in the night. When that happened, we knew that A.J. was beating our mother and we had to get up to protect her. To this day, if I hear a loud thump, I involuntarily start to panic.

12. As children, we were all aware of the abuse and saw a lot of it. When we were there, we would try to stop it, but there wasn't much that we could do as children. I recall A.J. would lock the doors and not let my mother or us get her medical care when she was beat up. We couldn't run out or do anything. I don't know why we didn't all break for the door, since there were so many of us, but we were kids and didn't think of doing that. I think because we saw A.J. beating our mother, we were scared to do anything for fear that he would turn on us.

13. I do remember picking up the phone once to call the police. A.J. jerked the phone out of the wall and I was left just holding the receiver. That was very scary because I thought A.J. would hit me, too, but he didn't.

14. Since there were so many of us, there were a lot of times when one of us did manage to escape and call the police. When they came, A.J. would be calmed down and act like nothing was going on. The police would sometimes take A.J. away, but my mother wouldn't press charges so he wouldn't get arrested.

15. When the boys got older, they would try to stand up to A.J. when he was beating our mother. My oldest brother Scotty left to go into the military right after high school because he and my father were on the verge of killing each other.

4

184

16. A.J. would beat my mother for any reason or no reason at all, mostly when he was drinking. A lot of times, we wouldn't know what the fights were about because they were already in progress when we woke up or came in the house. Other times, I know that A.J. was mad because he wanted my mother's paycheck, even though it was my mother who paid the bills in our house. I also think that A.J. was constantly jealous and suspected her of cheating on him, because he was always cheating on her. If my mom came home late from work, A.J. would accuse her of being out with someone else. This was totally ridiculous — my mother was a hard worker and would come home from the factory with bits of chicken all over her. She couldn't have been any place other than work, but A.J. would think she was doing something she shouldn't be doing.

17. Both A.J. and my mother could be harsh disciplinarians in the house. I rarely got beaten, though I recall one whipping when I was eleven when A.J. hit me with a slipper. I acted like he was killing me and I don't think that he hit me again.

18. But the boys would get harsh whippings from both of our parents with belts and switches and stuff. A.J. was definitely tougher with the boys than he was with Pam or me. A.J. would tell the boys to go pick their switch for a beating and if the one about to be whipped didn't run to get a switch immediately, someone else would go and grab a switch out of fear that A.J. would get madder and whip everyone. If A.J. was using a belt, he would hold whoever was getting hit by one hand so they couldn't run away, and whip them with the belt in the other hand. Those licks were so hard the boys would try to get away, but couldn't; they would go round and round in circles trying to get away as they were being struck. If you were really going to get a whipping, they took two switches and braided them together. The switch would leave welts on you that went away in a day or so, and everyone could tell you'd been whipped. The welts would be all over because

5

185

you'd try to get away and mom and dad would miss your bottom and get your legs and calves and arms. If you could pick what you'd get whipped with, you'd pick a belt because the switch felt like it was cutting into you like a knife. Sometimes when A.J. was whipping someone, he would say, "I brought you into this world; I can take you out."

19. The violence in my parents' marriage scarred all of us in different ways. Scotty became and remains a drug addict and an abuser himself. Pam has had her own problems with drug abuse and has been in a series of unsuccessful relationships with men; she only started getting her life together since she moved to Dallas two years ago and still has a long way to go. All three of the younger boys have gotten into drug dealing and been in trouble with the law.

20. The reason I appear to have succeeded is that I left home as soon as I could. If I had stayed there, I would have drowned. I married my husband, Jerry Ross, on October 11, 1996, and moved first to his parents' house in El Dorado while Jerry was in basic training in the military and then moved to Texas with him. If I hadn't married Jerry, I would have joined the military. I have put a great deal of energy and effort into keeping the events of my childhood at a distance from me. There was a period of time when I would not go back to Arkansas at all. Then later, when I went back, I would only visit with my brothers. Even today, when I visit El Dorado, I will only stay with my husband's family. I won't stay at the home of either of my parents, nor will I let my son Marco stay with either of them.

21. El Dorado is no place to be. Even today, people need to get away. There are no opportunities for young black people there. If you're not one of the privileged people, you're going nowhere. The majority who stay end up involved with drugs or incarcerated.

22. I have tried to help all of my brothers by having them stay with me in Texas at different

6

186

times, but eventually they went back to El Dorado. I think that if they could have gotten out of there, their lives would be different today.

23. Orlando came and stayed with me in Copperas Cove shortly after I moved to Texas. He lived with me for one semester of high school when he was about sixteen. He was doing much better in school there and seemed to be really happy. He was also really good with my baby, Marco. He would drop him off at the babysitter's on the way to school and pick him up at the end of the school day. Orlando would play with Marco and even changed his diapers. I really wanted for him to stay. But I was very young and had an infant and was going to college at the time. Jerry didn't make much money in the service and my parents didn't help out financially at all. Jerry and I realized that we couldn't continue to support Orlando in our home. We took Orlando with us on a trip to Arkansas when we went to pick up furniture that Jerry's parents had bought for us and we left him there without telling him that we would do that. This was devastating for Orlando. I think it left him with the feeling that he could never escape El Dorado.

24. My parents split up shortly after we left Orlando back in El Dorado. For me, that was one of the happiest days of my life. I was ready to have a party. I didn't know it would actually get worse for the others, but for the boys my parents' divorce created a different, worse situation because they were basically abandoned. After my parents divorced, I think my mom felt she had to sow some wild oats and, after a while, started seeing a man who lived in Smackover, Arkansas. She pretty much left the boys to themselves and they started to run wild. Even though Pam was living in El Dorado, she wasn't helpful because she had her own problems. Things got left to Orlando and I know that he wasn't coping very well with trying to run the house and raise Tracy and Demetrius. I would hear reports from friends that the boys had no food and that the electricity had

7

been cut off. I would hear from the boys that they didn't have lunch or didn't have clothes. They were eating a loaf of white bread and a sack of potatoes every few days.

25. Orlando didn't become involved in selling drugs until after my parents split up and abandoned the boys. I think that it all started with his having to look after his younger brothers. Orlando and I talked about his involvement in drugs several times, because I was very upset that he was doing that. I know that he was not happy about it either. He kept telling me that he was on the verge of getting out of the business and going straight.

26. Even though he was making money illegally, Orlando was always very generous. He would buy things for people in the family — for instance, he bought Pam a trailer home and A.J. a riding lawn mower and paintings for his house. Orlando's children had great toys. He wanted to give them the things that he never had. He also paid for Pam and her son to travel to Dallas for a trip to Six Flags with his own children. But you didn't have to be family for Orlando to want to help out. I remember him giving fifty dollars to some guy at the laundromat who was trying to get a dollar from me with his life's story.

27. It is so hard for me to understand Orlando's involvement in this crime because he has always been such a sweet and caring person. I visited him a lot before trial when he was incarcerated at Mansfield and FMC, and he was wracked with guilt and remorse. He couldn't sleep because he constantly had bad dreams. I know one was a recurring dream about Lisa Rene's mother coming to him and asking him why he did this. Although he has always avoided talking to me about what happened, he has told me that it shouldn't have happened, that Lisa Rene was innocent. I recall that LaTonya's sister would sometimes sing a spiritual to him on the phone, I think it was "I know the Lord, He Heard my Cry," and he would cry every time.

8

188

I declare under penalty of perjury that the foregoing is true and correct. Executed on ___

12 May '00 (date).

CASSANDRA ROSS

9

189

Exhibit 17

Declaration of Pamela Palmer

190

## DECLARATION OF PAMELA PALMER

Pamela Palmer, pursuant to the provisions of 28 U.S.C. § 1746, makes the following declaration:

1. My name is Pamela Palmer. I am Betty Hall's oldest child and was born on November 1, 1964. My father was Betty's first husband, the Reverend Raymond Palmer. Rev. Palmer and my mother separated before I was born and were divorced when I was a few months old. My mother began seeing A.J. Hall when I was an infant and married him before my first birthday. My biological father did not have anything to do with me when I was growing up and I have always considered A.J. to be my daddy. I grew up in the same family as Cassandra, Scotty, Orlando, Tracy and Demetrius, who were all born after me. I was six and a half when Orlando was born.

2. For as far back as I can remember, Betty and A.J.'s relationship was stormy and violent. A.J. was jealous and wanted to run things, and would become physically and mentally abusive to our mother. He would call her "bitch," "whore" and "slut" in front of us kids. He would often become physically violent. I remember once he hit my mom in the head with a .38 caliber gun in the back yard. I think that sent her to the hospital. On another occasion, he threw her through the plate glass picture window in the front of our house on Kearing St. in El Dorado. I remember one time I was sitting on the floor with my mom in the den and A.J. was sitting there. All of a sudden he jumped down and started beating her for no reason. Often the abuse would happen when A.J. was drinking, but not always. He was just mean -- and still is.

3. Our parents frequently fought at night, when we were in bed. We could hear the yelling and hitting, but couldn't do anything because we were just little children. I remember feeling sad, angry, terrified, helpless -- I loved both of them. When I was old enough to figure it out, I realized that A.J. often forced my mom to have sex with him after beating her to a pulp. I could hear it, lying in my bed.

4. A.J. was only taken to jail once for beating my mom. That was in 1974. His brother T.J. got him out and Betty never pressed charges again. I think she figured there was no point because A.J. would just be madder if she did. On my dad's side, all the men were like that and beat their women. They also all cheated on their women. T.J. was married to Lillie Mae, but had a girlfriend, Dorothy, on the side. A.J. cheated on my mother -- not only by going around with other women, but by keeping money in a secret bank account. We only learned about that after my mom left him.

5. The abuse took its toll on my mother. She suffered from lots of headaches and migraines and had high blood pressure. She was depressed and tired all the time. She didn't want people to know she was being beaten and would try to hide her bruises. I remember that she had a blood clot or aneurysm in her brain in the late 1970's or early 1980's.

6. The violence in our home was not only between my mom and A.J. Both our parents could be harsh disciplinarians, but A.J. was the worst. He would whip our asses with a belt or a switch

Declaration of Pamela Palmer -- 1

when we did something wrong. The switches left big welts. He would make one of us run to get a switch for the beating. A.J. hit the boys more than he hit Cassandra and me. Sometimes, he didn't know when to stop and it was like he had gone crazy. Mom would try to get him to stop when he was totally out of control.

7. I tried to leave home when I was just a teenager. I asked Reverend Hegler and his wife if I could move in with them. I was fifteen and tired of all the violence in our home. I would sometimes spend the night at the Heglers' house, but they couldn't really take me in, since I had my own family and they had theirs. In 1988, I finally moved out of my parents' house and got my own place.

8. My mom moved out when Demetrius was thirteen and old enough to understand what was going on. I think that was in 1988 as well, after I had already left. Scotty and Cassandra had long since left home as well. Betty just packed up and moved out one day. She got a place for herself and the three youngest boys on El Dorado Avenue. Later she moved to School Street.

9. Things fell apart for the boys after Betty moved out with them. She needed to be strict with them, but instead she went buck wild. She met a man named John Powell and started seeing him. Eventually she moved in with him in Strong, Arkansas, and pretty much left the boys to fend for themselves. I can understand what she did – she had stayed married to A.J. through 24 years of abuse – but I would never put a man before my children. When Betty met John Powell, she was in "la-la land." The boys were left to take care of themselves and had no supervision. There were times when the electricity was turned off and there was no food in the house. To this day, my mom and I are not real close because I became so angry at her on account of how she abandoned the boys during that time.

10. Orlando got a job at Sav-Mor, a grocery store in El Dorado, but started hanging out with the wrong crowd. I think he got into selling drugs in 1989. It's not hard to understand why it happened – Orlando could see that the guys selling drugs had nice clothes and cars and women when he was having trouble making sure his younger brothers were fed. And since Betty was busy running around with her man, there wasn't anyone to set any limits for him. Even though he started making money the wrong way, Orlando was always generous with his money. He didn't mind helping anyone and would do good with the money he made – he used the money to help his family and friends. He made sure that his children were clothed and fed.

11. Orlando was always a generous person. Even as a child, he was sweet and very giving. If he had a piece of candy and another child didn't, he would give away his candy. He was active and energetic and liked to be on the go. I think that he did okay in school, but like the rest of us (except Tracy and San), he was in remedial classes.

12. Orlando saved the life of my child Syroid in 1994 when Syroid was around three years old. We were all in Baton Rouge, Louisiana, to celebrate the law school graduation of my half-sister Vada's husband, David Smith, and were at a Holiday Inn on Airline Highway. I heard a scream and saw someone jump off a balcony by the pool. I learned that it was Orlando, who had seen that

Declaration of Pamela Palmer – 2

Syroid had fallen into the pool and was drowning. Orlando had jumped to the ground from the second floor to go in the pool and rescue him. When I got to the pool, a white man was there giving Syroid CPR. My mom had passed out from a seizure or something, and she and Syroid were taken to a Baton Rouge hospital. Syroid was there for two days.

13. When this crime happened and my brothers Orlando and Demetrius were arrested, it tore me apart. I was in a deep depression and wanted to kill myself. Reverend Hegler helped me during this period – I saw him every Tuesday for therapy. With his help, I was able to get my life back together. I eventually moved to Dallas with Syroid in 1997 and things have been much better, being away from El Dorado.

14. I never met the attorneys who represented Orlando at his trial. Shortly before the trial, I was contacted by a woman named Tena. I was still very upset at the time about everything that had happened and had difficulty talking to her about my family and Orlando. We didn't talk long. I feel like I would have been able to tell her about all the things that I have talked about here if there had been more time to deal with the painful emotions that they brought to the surface, but I never saw her again. I know that I would have wanted to help out with Orlando's defense because I really love my brother, but I wasn't given the opportunity to help out.

15. I did not meet any lawyers representing Orlando until the spring of 2000, when Orlando's current attorneys, Marcy and Rob, came to Dallas and spoke with me. I also met with a woman named Jill Miller, who is helping with Orlando's case. I was able to tell them about my family and the things that happened when we were young because they gave me space to deal with the pain of talking about these events. If Orlando's earlier lawyers had done the same, I would have been able to testify about these events.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 6-13-02 (date).

*Pamela Palmer*
PAMELA PALMER

Declaration of Pamela Palmer – 3

Exhibit 18

Declaration of Scotty Hall

194

## DECLARATION OF SCOTTY HALL

Scotty Hall, pursuant to the provisions of 28 U.S.C. § 1746, makes the following declaration:

1. My name is Scotty Hall. I am the oldest son born to the marriage of A.J. and Betty Hall. I grew up in my parents' house in El Dorado, Arkansas, along with my older half-sister, Pamela Palmer (my mother's daughter from a previous marriage); my older sister, Cassandra Ross; and my younger brothers, Orlando, Tracy and Demetrius Hall. I am currently incarcerated in the Cole State Jail in Bonham, Texas on a five-year sentence for drug possession. I expect to be released in the summer of 2002.

2. I was born on November 15, 1967. Cassandra is about eleven months older than me and Pam is about three years older than me. From my earliest recollections, Pam basically was raising us because our parents worked all the time. Pam was pretty bullying — it was her way or the highway. If you didn't listen, she'd tell you to get out. All of us also spent time with different relatives. I stayed with one of A.J.'s sisters, "Aunt Sister," a lot of the time. Tracy stayed with another of A.J.'s sisters, Luella Crow. Orlando stayed with my mom's sister, Velma. Orlando and Pam would also go to visit relatives in Louisiana. Orlando was Velma's baby. If something went wrong, Tracy or I was the one to look for — not Orlando or Demetrius, because they didn't misbehave.

3. I feel like I pretty much grew up in the streets. Even though I had a roof overhead and food and clothes, my parents were always working and Pam was too much of a bully. There wasn't a real sense of family. For instance, we didn't have dinners together; there wasn't any real family time at my home. The things I talk about with my own children weren't discussed in my house growing up.

4. Cassandra and I distanced ourselves from home by playing a lot of sports and doing well in school. I played football, basketball and baseball, and ran track. That kept me going in my youth because home was a miserable place to be. My parents' relationship was very violent as far back as I can remember. If I was in school or playing sports, the problems at home disappeared. When I got home, it would all hit me.

5. I grew up seeing my dad hit my mom. If my mom had an opinion of her own that he didn't agree with, there would be a fight. But my dad didn't even need a reason. I remember being at the home of my mother's niece, Robbie Charles, one day when my dad had been drinking. He came in and just lit into my mom, hitting her with his fists in her face and anywhere he could. I felt scared and helpless watching the woman I loved being beaten down. I felt guilty because I couldn't help her. If we kids tried to intervene, my dad would throw us off and then get back at her. When I was in the 10th grade, I was older and stronger and would tell my dad not to put his hand on my mom. One time he did and I knocked him to the floor. My dad was less violent when he wasn't drinking, but it seemed like he drank -- hard liquor and beer -- pretty often.

Declaration of Scotty Hall -- 1

6. My dad's violence ate away at my mother. She had a beautiful singing voice and churches would pay her to sing at revivals. But my mom was battered so much she didn't have any self-esteem. Even though my mom made more money than my dad, he made all the decisions. My mom used to be very fair skinned, but now her eyes are black from the beatings she used to get. She had headaches a lot. I remember her as very nervous and high-strung. She smoked three packs of cigarettes a day and drank lots of coffee. I think she was depressed. When her mother died, my mom was really depressed. She would sit in the dark crying. My grandmother had been her backbone and my mom really grieved. I think Orlando was eight or nine at the time.

7. The violence in the home was also directed at us kids. Both our parents could be harsh disciplinarians, but my father was the worst. My dad would whip us with a leather belt or a switch. He though the leather belt made you tough, but the switch would cut you. As we got older, it wasn't a belt or switch; it was his fists. My mom couldn't protect us, because he would whip her to. But my mom sometimes would whip us as well or she'd tell our dad what we'd done, so he could whip us later. I remember laying in bed in terror, waiting for whippings that I knew were coming, but didn't know when. At the time, I thought all black families were like that.

8. Life in El Dorado was violent, too. Orlando and I have seen murders. My uncle TJ had a club right behind our house, Anybody's Club. Our dad's first cousin, Harry J., who was the original owner of the club, died right outside it. He had been poisoned and his car was set on fire with him in it. Orlando and I both saw the burning car with Harry J. inside. Another time, we were with Eric Steele when he was shot twelve times. Other friends of Orlando's, like Corey Brown, were shot and killed. Corey had spent the night with us and in the morning I dropped him off at his house. He was coming back to our house when he was robbed and shot in the head. Other friends of ours, like Steve Gentle and Sandy, died of drug overdoses. Seeing people die so casually made you feel like you didn't have much of a chance to survive.

9. I tried to get away as soon as I graduated from high school by joining the military. I thought that the service would help me get out of the situation in El Dorado so I could help my family. I would call home a lot when I was in the military to talk to my mom and make sure she was all right. I was constantly afraid that my dad would kill her. I was in the army from 1986 to 1990 and received a general discharge out of Fort Jackson. Later, I studied hotel-restaurant management for a while at City College of Chicago.

10. The violence and lack of structure in my childhood has definitely impacted me for the worse. I think that watching my father beat my mother contributed to my doing the same thing to women in my life. I have four children, all by different women living in Arkansas. Three of my children were born the same year and are around fourteen. The fourth is eleven. I have had serious drug addiction problems for years that I am hoping my current incarceration and treatment will help me finally escape. A lot of the men in my dad's family, including my dad, have had problems with drug and alcohol abuse, as well. I try to talk to my children about taking responsibility and not

Declaration of Scotty Hall -- 2

K16

mking the same mistakes that I have made all my life.

11. Our childhood impacted Orlando differently. My parents split up when I was in Germany in the service. My mom got involved with a man and left the younger kids to fend for themselves. Cassandra had already gotten married and moved to Texas. Orlando had to look after Tracy and Demetrius. He worked at the Save More and then left school. Jobs are hard to find for a black man in Arkansas; it's hard to feed and clothe three kids on minimum wage. When Orlando was old enough to get out, he got caught up in the drug trade instead.

12. I remember meeting with Tena Francis prior to Orlando's trial, but don't think that I spoke with her much about our childhood. These matters are very painful to me and I have always tried to avoid thinking about them. By the time Jill Miller came to see me here at the prison, I had met with another investigator, Neil Hartley, and once met Orlando's attorney, Marcia Widder, when she was visiting with my mom in Arkansas. It was Jill Miller, however, who drew most of this information out of me. We had a very emotional meeting. I even broke down and cried. When Ms. Miller later talked to me on the phone to see how I was doing, I cried as well. I hope this information can help my brother, Orlando. Even though we weren't really taught right by our parents, we've always tried to look out for each other and love each other very much.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 6-06-02 (date).

Scotty Hall
SCOTTY HALL

Declaration of Scotty Hall -- 3

Exhibit 19

Declaration of Tracy Hall

<u>DECLARATION</u> ▓▓▓▓▓▓▓ OF TRACY HAL▓

Tracy Hall, pursuant to the provisions o▓ ▓▓▓▓▓▓▓▓▓▓▓▓ ▓28 U.S.C. §1746, n▓

1. My name is Tracy Hall. I reside in A▓ ▓▓▓▓▓▓▓▓▓▓▓▓ rlington, Texas. Ork▓ I am two years younger than Lan.

2. When I was little, my parents some▓▓▓▓▓▓▓▓▓times argued and f▓ pretty tough relationship. They wou▓▓▓▓▓▓▓ld not always let us k▓ have definitely seen my dad hit my m▓▓▓▓▓om. I haven't talked▓ brothers and sisters and I never disc▓▓▓▓▓ussed it with one an▓

3. My mom and dad definitely believe▓▓▓▓▓▓l in physically punisl▓ whupped, with a belt or a switch, fo▓▓▓▓▓▓ whatever we did. ▓ us, but sometimes one of them put ▓▓▓▓▓t off on the other. ▓ handed. Sometimes, we would kno▓▓▓▓w we were going t▓ know when it was coming. My dad ▓▓▓would just let us wait▓ and wonder when it was going to hap▓▓▓▓pen. Me, my broth▓ in the family calls "Jack"), and Lan ▓▓▓▓ll shared a bed. Sor▓ because he was so scared thinking a▓▓▓▓nd wondering about▓ whupping, and when he did he got ▓▓▓whupped for that.

4. I spent a lot of time at my Aunt Lu▓▓▓ella's when I was gr▓ around the house when my parents ▓▓▓▓argued and fought. house because she spoiled me. Mos▓▓▓▓ Fridays, I would g▓ and stay there. At our house, thing▓▓▓ were financially tigl▓ things you wanted. In fact, money▓▓▓ was one of the thi▓ fighting about. Mom was working a▓▓▓▓nd earning money an▓

## DECLARATION OF TRACY HALL

Tracy Hall, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is Tracy Hall. I reside in Arlington, Texas. Orlando Hall ("Lan") is my brother. I am two years younger than Lan.

2. When I was little, my parents sometimes argued and fought. I would say they had a pretty tough relationship. They would not always let us kids see what was going on, but I have definitely seen my dad hit my mom. I haven't talked about that stuff very much. My brothers and sisters and I never discussed it with one another.

3. My mom and dad definitely believed in physically punishing us kids. We got our butts whupped, with a belt or a switch, for whatever we did. Both mom and dad would whup us, but sometimes one of them put it off on the other. My mom was especially heavy-handed. Sometimes, we would know we were going to get a whupping but we didn't know when it was coming. My dad would just let us wait; sometimes we would lie in bed and wonder when it was going to happen. Me, my brother Demetrius (whom everybody in the family calls "Jack"), and Lan all shared a bed. Sometimes Lan would wet the bed because he was so scared thinking and wondering about whether he was going to get a whupping, and when he did he got whupped for that.

4. I spent a lot of time at my Aunt Luella's when I was growing up, so I was not always around the house when my parents argued and fought. I liked staying at Aunt Luella's house because she spoiled me. Most Fridays, I would go over to her house after school and stay there. At our house, things were financially tight and you couldn't have all the things you wanted. In fact, money was one of the things I remember mom and dad fighting about. Mom was working and earning money and putting it in the bank, and then

dad would get it out and spend it without her knowing. At Luella's, I didn't have to share the attention as much; it was just me.

5. I remember one Christmas when Lan and I got bicycles. There was a red one and a yellow one. The red one was a two-seater. I wanted the yellow one, so I could ride by myself. Lan wanted the yellow one, too, and he got it. Lan was my mom's favorite.

6. My mom seemed tired a lot of the time. Before she and my dad split up, her eyes started getting black, real dark, and she started to look old. She had always been real pretty. I know she was depressed, because she went through a lot. It was hard for her to give attention to all us children.

7. Lan wasn't that good in school, and neither was Jack. I think that Lan may have had a hard time learning. I did well in school for a long time. I think I worked especially hard to get my mom's attention. For several years, my grades were nearly good enough for the honor roll. When my mom and dad split up, though, I quit caring about school. I didn't think it was that serious at first, but soon it became obvious that their marriage was over for good. When my mom went to be with John Powell, and left Lan, Jack and me alone, I felt nobody cared. And I felt that if nobody else cared, I didn't care either.

8. When Lan, Jack and I were left on our own, Lan still made me go to school. It was a difficult time because we didn't have any money to live on and neither of our parents was helping us. I didn't have much to wear, and the electricity and phone were turned off at times because the bills weren't paid. There was not much food to eat, either. I felt deserted, and Lan and Jack felt the same way.

9. That was when Lan started selling drugs. I think he felt he had to pay the bills and take care of Jack and me, and nobody else in the family was stepping forward to take

200

responsibility for us. I know Lan felt responsible for me and Jack. If it hadn't been for Lan, it would have been a lot worse for us after my mom left us. Lan sold drugs for survival -- to help us and the family survive.

10. Before long, I started sneaking around behind Lan's back and selling drugs myself. I got them from Dexter Wayne, who was Lan's "partner" in the drug business. Dexter got me started selling. I was trying to keep it from Lan because I knew he would be upset. He did not want me or Jack to get involved in what he was doing. I had a different motive than Lan. He wanted to survive -- I wanted to have attention and buy nice things.

11. I know that as the years passed, Lan wanted to get out of the drug business. It was not a good life. The deeper you got into it, the more dangerous and frightening it became. Lan and I both felt that we could be dead at any time. We saw a lot of people hurt and a lot of people we knew died. People will do a lot of bad things to get drugs, and when you are selling drugs, you can be a target. When Lan was in prison in Arkansas, I was still on the street doing business. Lan encouraged me to stop selling, to get away from the business and move to Texas where I could get away from the people in El Dorado we were mixed up with. I moved, but I kept selling drugs.

12. Lan has always tried to be a good father to his kids. He has spent a lot of time with them, especially Eric and Te'Aushia. He did his best to provide for them and gave them lots of love and attention. Even now, he calls his kids on the phone from prison as often as he can afford to, to find out how they are doing in school, to talk to them about any problems, and to encourage them to live the right way.

13. The best way to describe Lan is as a person who will help you out if he can. He cares deeply about his family and there wasn't anything in the world he wouldn't do for you.

20 1

He always told me to do right and stay out of trouble. It hurt me bad when this happened, because Lan was everything to me. I am 29 years old and I've had enough of being in trouble. I want to see my kids grow up. It hurts me to think that Lan won't have the same chance.

14. I do not recall being contacted by Lan's attorneys or anyone working with them prior to his trial in 1995. I was in prison in Arkansas at that time. If I had been contacted, I would have told them the same things I have said here, and I would have been willing to testify to these facts if called as a witness.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____ 6/6/02 (date).


TRACY HALL

202

Exhibit 20

Medical records of Betty Hall

203

EMERGENCY RECORD

EMERGENCY ROOM NUMBER 1067
PM. Date 5-14-68

NAME Hall Betty
LAST    FIRST    MIDDLE    SPOUSE A. J. Hall    IF MINOR, NAME OF PARENT

ADDRESS 521 Keasing    PHONE 21631    AGE 12 V

DOCTOR Fischer Dr. Harper    Brought To Hospital By: Self ☐ Police ☐ Relative ☐ Other:

Manner Of Admission: Walking ☑ Wheel Chair ☐ Stretcher ☐ Other:

Occupation Housewife    Employed By

Injured? Yes ☑ No ☐    On The Job? Yes ☐ No ☐    Insurance? Yes ☐ No ☐    Welfare? Yes ☐ No ☐    County ☐

Insurance Co. Group Facility    Group Number    Claim Number

STATEMENT OF COMPLAINT BY PATIENT OR PERSON BRINGING PATIENT TO EMERGENCY ROOM:

Pt. states she + husband had a fight & he hit her with handle of pistol on forehead & back of head. Stomped face & L. foot...

EXAMINATION: T 98.8   P 104   R    BP 130/80

DIAGNOSIS: Lacerations + contusion forehead, top of scalp + occipital area - left foot, left thigh + buttocks + R. Skull

TREATMENT AND/OR PROCEDURE:

Gen. Physical exam
Wounds cleansed - sterile dressing

J. W. Harper
ATTENDING PHYSICIAN

DISPOSITION OF CASE:

Home ☐ Transferred ☐ (Where)    Admitted ☐ (Number    ) Died ☐

LVN
RN

204
MEDICAL RECORD

014

Exhibit 21

Arrest record of A.J. Hall

EL DORADO POLICE DEPARTMENT

DONALD TATE
Chief of Police

W. M. HICKMAN
Chief of Detectives

IDENTIFICATION DIVISION
El Dorado, Arkansas

A.S.P.:

Date:   November 15, 1994

F.B.I.:

The Following is the Record of E.P.D.# 12634

| Contributor of Record | Name and Number | Arrested or Rec'd | C-Charge D-Disposition |
|---|---|---|---|
| AR0700100 POLICE DEPARTMENT EL DORADO, AR #12634 | Alvin Hall | 04-13-74 | C-Assault & Battery D-FORF |
| | A. J. Hall | 01-08-81 | C-Dog at Large D-FORF |
| | A. J. Hall | 05-26-86 | C-Dog at Large D-FORF BOND |
| | Alvin James Hall | 01-16-89 | C-Dog at Large D-BONF FORF $61.75 |

NOTICE:  This is Furnished for Official Use Only.

Signature _Anita H Bird_

206

# WARRANT OF ARREST

### MUNICIPAL COURT, EL DORADO, ARKANSAS

STATE OF ARKANSAS,
COUNTY OF UNION

TO ANY SHERIFF, CONSTABLE, CORONER, OR POLICEMAN IN THE STATE, GREETING:

It appearing upon information that there are reasonable grounds for believeing that _Alvin Hall, 521 Kearing E. Dorado, Ark._

has committed the offense of _Assault & Battery_

in the County of Union, State of Arkansas, you are commanded forthwith to arrest the said _Alvin Hall_

and bring him before the judge of this Court, to answer said information and to be dealt with according to law.

Witness my hand and seal of said court, this _13th_ day of _April_, 19_74_.

_Patricia Wilson_
Clerk, Municipal Court of El Dorado, Ark.

You are also commanded by said judge to summons as witnesses for the State of Arkansas:

_____ No._____ Street_____

_____ No._____ Street_____

_____ No._____ Street_____

_____ No._____ Street_____

_____ No._____ Street_____

_____ No._____ Street_____

207

126344

## ARREST RECORD

74-1099

Date 4/13/74  Time 4:43 P.M.  Docket No. 74-1099

Name ALVIN HALL   Color A  Sex M  D.O.B. 1/7/30

Address 521 Kearing   Cash 54 2⁵ B4.5530 Bond

Place of Employment Perdue   of - 4/15/74

Offense Assat & Battery   Personal_____ Bond

Disposition_____ Jail

Witnesses_____

Social Security No. 436-385008

Driver's License No. C245-3568  State_____

F.B.I. #_____ State #_____ Mug___ Fingerprint_

Facts as to arrest On Warrant by Betty Hall

_____ Arresting Officer

HURLEY - EL DORADO

208

Exhibit 22

Declaration of D.L. Hegler

209

## DECLARATION OF D.L. HEGLER

D.L. Hegler, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is D.L. Hegler. I reside at 1213 South West Avenue in El Dorado, Arkansas. I have personal knowledge of the facts set forth in this declaration.

2. I am pastor of the Douglas Chapel Missionary Baptist Church here in El Dorado. I have been a minister for twenty-one years. I have known Orlando Hall and his family for that entire time.

3. I am an Arkansas native; I was raised in Camden, which is not far from El Dorado. I attended the University of Arkansas at Pine Bluff, graduating with a B.A. in English, Speech, and Theatre Arts. After obtaining my undergraduate degree, I relocated to the San Francisco Bay area in order to attend seminary. However, I decided thereafter to return to Arkansas. I initially lived in Little Rock, and while living there I began to fill in for a local minister here at the Douglas Chapel Missionary Baptist Church. in El Dorado. After he resigned and ultimately retired, I became pastor at that same church. I have held that position ever since.

4. In addition to my undergraduate degree, I have completed 45 of 48 credit hours required to obtain my M. Ed. in Agency Counseling from Southern Arkansas University. When I finish my Master's degree, I will have participated in a total of 400 hours of practical clinical counseling under the supervision of a licensed counselor. At that time, I expect to pursue my doctoral degree in Pastoral Counseling from Albany (Georgia) Bible College.

5. I met the Hall family when I became pastor at Douglas Chapel. I met Betty first, because at that time she was the only member of the family who was attending church. However,

210

I soon met A.J. and all the children in the family, because I married in 1980 and my wife and I moved to Kearing Street, where the Halls lived, shortly thereafter. We stayed there for about two years, living just two houses down from the Halls, so I had regular contact with the whole family from about that time.

6. In addition, after I had been in El Dorado for a year, I started teaching at El Dorado High School. For years, I taught students in the 10th and 12th grades. My wife teaches at Westwood Elementary School in El Dorado. At El Dorado High, I taught several of the Hall children – Pam, Orlando, and Demetrius.

7. I first got to know Pam Hall, Orlando's sister, because she would come down to our house pretty often. When she was a young teenager, in fact, Pam asked us to adopt her, and at least once asked her own mother whether she could come live with me and my wife. Pam told me that she felt her own parents were not giving her the right kind of guidance, and that she believed my wife could teach her to be a lady. Sometimes we let her spend the night with us, when she seemed especially anxious to be out of the Hall home. I learned from my conversations with her that she was ashamed and frightened by what went on from time to time between her parents.

8. I was aware that there was a great deal of physical violence between Mr. and Mrs. Hall, and that their home was full of emotional discord as a result. I knew this not only from Pam and her sister Cassandra, but also from my contacts with Mrs. Hall and just from living in the same neighborhood with them. It was no secret that A. J. and Betty Hall fought constantly. From time to time, I saw Betty with black eyes after she and A.J. had been fighting. I know that Pam suffered emotionally from being in that environment and that her experiences in the home had a lot to do with her seeking refuge with me and my

211

wife.

9. The violence between A.J. and Betty was severe and frequent. It took place in front of the children even when they were very small. I am not sure what sparked these explosions, but I know there was a lot of drinking involved and that the marriage was roiled by infidelity and accusations of infidelity. Whatever caused the violence, it was serious. A.J. and Betty fought not just with their fists, but, by their children's account, with whatever weapons were at hand.

10. Despite having endured this environment, the Hall boys worship their mother and downplay the violence perpetrated by their father. The boys make the family sound like the Cleavers, but I know full well that they are not telling the truth about how things were in those days. I also heard from family members that when A.J. and Betty got after the boys, they would hit them with whatever was available. Despite the severity of these beatings, the kids considered them to be punishment, not abuse.

11. The Hall children grew up in a tough neighborhood where any number of destructive influences were at work. There was a tavern, "Anybody's Place," located directly behind the Hall's house on the next street over. "Anybody's Place" was marked by frequent drug activity, prostitution, and bootlegging, and violence there was common.

12. I know the Hall boys well enough to say that I was completely taken by surprise when I learned of Orlando's involvement in this crime. I strongly suspected that he had become involved in selling drugs, and he had practically admitted as much to me on several occasions when he came to me in confidence. But of the boys in the Hall family, I would have described Orlando as the least likely to become involved in a violent crime. In part, that is because I knew that Orlando was torn about his continuing involvement

212

in the drug trade and that he sometimes wanted very badly to get off the streets and go straight. I recall one night in particular, when Orlando came to my house at 1:00 a.m., wanting to talk to me. I have an "open door" policy at my home, and kids in the community know that they are welcome to seek me out anytime. So I visited with Orlando that night, and I remember him finally admitting he was involved in selling drugs and saying that it would almost be a relief to get caught, do his time, and be through with the life he had become entangled in.   But at the same time, he was still seduced by the easy money and the superficial glamour of the lifestyle he was leading, so I was not surprised he never managed to make that clean break with his past.

13. One reason I was so surprised by Orlando's involvement was  because he was never, to my knowledge, violent. He never raised his voice and never got angry, even when other fellows would try to provoke him. Once, I saw another young man trying to prod Orlando into fighting him over some girl. This fellow pushed Orlando in the chest several times, trying to get him to strike back. Orlando just laughed and brushed it off.

14. But it was more than just not being violent; Orlando had many strong, positive personality traits.   I saw him around almost every day in school and I was well acquainted with those characteristics. You couldn't dislike Orlando. He was good-natured, outgoing, and warm. He had no "mean streak;" he might pull pranks on other students, but it was never malicious. He always impressed me as compassionate and willing to reach out to people who were in need. He treated his classmates with respect, even the ones who were "outcasts," and his attitude toward those kids helped them gain acceptance because Orlando was so popular. He was also devoted to his brothers and sisters, and concerned for their well-being. Although he did not apply himself to his

213

studies and lacked confidence in his academic ability, I remain convinced that he had the native intelligence to do almost anything he set his mind to.

15. While I was surprised at Orlando's involvement in this crime, I was not surprised that he became sucked into the drug business in El Dorado. The African-American community in El Dorado faces a huge struggle in trying to hold on to its young people and provide them hope. I have an intimate familiarity with our town's young African-Americans, not just from my role as a pastor and a schoolteacher but from other activities in which I spend a lot of time with teenagers and get to know what they are thinking and feeling.

16. Without excusing for a moment their involvement in illegal activities, I feel it is important to understand why young African-American men in our community can end up in the drug trade, as Orlando and his younger brothers did. I believe that a great deal of that activity can be traced to the fact that a lot of the black kids here feel that they have no future. You can see it when you look at them, even at a very early age. The broader culture they are exposed to does not give them meaningful positive role models, and the local economy does not offer them any opportunities for stable, long-term employment at a reasonable income. Their job options are extremely limited. Unless they have connections in one of the few high-paying plants in the area – and few black people have those connections -- all they can do is work on the "production line" cutting up chickens at Con Agra, or perhaps get a low-paying position at a fast-food restaurant. The few kids who make it to college, if they make it through college, don't come back to El Dorado. If they don't complete college, they come back here and things are even worse, because they couldn't manage to escape. The ones who stay here graduate from school into poverty and hopelessness, just looking to get by.

214

17. As a result of this pervasive feeling of hopelessness, many of the children of the African-American community, as they grow older, begin to believe that the only goal they can realistically pursue is making money through dealing drugs. That life is tempting because it looks easy and glamorous, and it appears to offer these kids not just material goods, but something they can't get in other parts of their lives – a way to command respect, even if it's for the wrong reasons.

18. In part, the lack of hope among the young people in the African-American community in El Dorado is also a result of the continuing terrible toll exacted by racial prejudice. You can see its consequences in the economy, for example. When I first came to El Dorado, there were virtually no black-owned businesses. Yet, I know from talking to older people in the community that at one time in the relatively recent past there were such businesses. Now, the only businesses thriving in the black community are liquor stores – and they practically surround our neighborhoods. And no one should think that there's no money at all in El Dorado – on the contrary, there may be no other city in Arkansas with so much money concentrated in the hands of so few families. But the vast majority of those families are white. And even for black families that work hard to attain middle-class status, there is a strong resistance to people getting "out of their place." The opportunities for advancement, in the workplace and in the community generally, are foreclosed above a certain level. As a result, I have seen talented middle-class African-Americans leave El Dorado because they were being denied the opportunity to rise according to their ability.

19. The effects of racial prejudice make themselves felt in other ways. When I came to El Dorado in 1979, I believe I was the only African-American man of my age in the city

215

with a college degree. At that time, there wasn't a single black teacher in the English department at El Dorado High School. For ten years, I was the only one. Even now, very few black teachers are employed at El Dorado High School, and not one of our local schools has a black principal, despite the fact that a majority of the students are African-American. In contrast, many of the private schools in the area – Westside Christian School and Holy Redeemer, for example – are almost all-white. One destructive consequence of the lack of African-American teachers and administrators is that our young black people lack positive role models in the environment where they spend most of their time during their formative years.

20. Again, I do not in any way excuse or condone the illegal activities of the young black people in our community who choose to become involved in selling drugs. Nor would I ever deny the destructive influence that such drugs have had on our community, by addicting many African-American people and ruining their lives. But I think it is unrealistic to condemn the drug trade without recognizing that the young people who get drawn into it, like Orlando Hall, are not totally responsible for their own involvement. Their decisions are influenced by the lack of opportunities available to young African-Americans to build meaningful lives and futures in El Dorado, and by the absence of positive parental role models and daily adult supervision to provide discipline and structure during their most vulnerable years.

21. I was present at the penalty phase of Orlando's trial in Fort Worth. I was ready and willing to testify on Orlando's behalf, and would gladly have testified to all the facts contained in this declaration. However, I was never called as a witness.

22. Prior to Orlando's trial, I was interviewed by a lady who was working for Orlando's

216

lawyers. She spoke with me in El Dorado, and we had a fairly lengthy conversation in which I told her all the things set out above.

23. I believe I may also have spoken here in Arkansas to one or two men who were also working on Orlando's behalf, although I don't recall exactly who they were. That conversation was shorter than the one I earlier had with the lady.

24. I was subpoenaed to Orlando's trial in Fort Worth. I was telephoned one evening, without any advance notice whatsoever, and told that I needed to be in Fort Worth the next morning. I responded that I could not change my schedule on such short notice, and I was told that I would be under a court order to attend. Accordingly, I drove to Fort Worth. I thought I would testify, but I didn't. Instead, I sat outside the courtroom and waited. At one point, I was escorted briefly to the nearby office of Orlando's lawyer, where I was told that I would be asked basically about the family situation in the Hall home. I returned to court but was not called to testify that day, and at the end of the day I drove all the way back to El Dorado because I was not prepared to stay the night in Fort Worth.

25. The next morning, after very little sleep, I drove back to Fort Worth. I believe that was Friday. That day, Betty Hall was called into the courtroom. I was not. At some point, Orlando's attorneys came out and said I would not be called to testify. Although I cannot recall his exact words, he said there would be an appeal at some point in the future, and I would probably testify then.

26. While Orlando was in jail awaiting trial on this charge, I corresponded with him. In one letter, Orlando expressed feelings of great shame and remorse for his involvement in the crime. He said he knew he had hurt many people by his actions, and had disappointed

217

everyone.  He said he couldn't forgive himself for what he had done, and didn't believe anyone else should forgive him.  He also asked me to pray for him, to take care of his mother and his children, and to come talk with him if I could.

27. When I was in Fort Worth for Orlando's trial, I was allowed to visit with him alone.  In speaking with me, Orlando expressed great remorse for his role in Lisa Rene's death.  He told me he was unable to sleep and that he could not close his eyes without seeing her.  Orlando blamed himself because he felt he should have "taken over" and saved her life.  He told me that he still heard her pleading to him to save her, and that he felt enormous guilt over that.  Orlando also said he didn't expect Lisa Rene's family to forgive him, and that he could not forgive himself because Lisa was a black woman with many gifts who represented a hope for her people.  He said he wanted to say he was sorry, but was afraid it would insult her survivors for him to do so.

28. We also prayed together and talked about Orlando's salvation.  In addition to expressing his feelings of remorse about Lisa Rene, he spoke of his great concern for his children and for his brother Demetrius.  He was definitely not focusing on himself, but on others.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ____May 11, 2000____ (date).

REV. D. L. HEGLER

218

Exhibit 23

Declaration of Eric Hampton

219

## DECLARATION OF ERIC HAMPTON

Eric Hampton, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1.  My name is Eric Hampton. Orlando Hall is my father. I live at 726 El Dorado Ave. in El Dorado, Arkansas.

2.  I was born on June 28, 1985, and am in the 11th grade at El Dorado High School, where I run track and will be ~~going out~~ on for the football team, this fall.

3.  My father once saved my cousin, Syroid, from drowning after Syroid fell into the pool at a Holiday Inn. We were on a family trip at the time. I was in the hotel room with my father, my grandparents, and some other relatives. This room was on the second floor and had a balcony over the pool area. Syroid had stayed down at the pool with the other kids. We noticed that Syroid wasn't in the room and I saw my father jump over the balcony, onto the ground and then jumped into the pool. ~~into the pool below~~. I went to the balcony and saw that my father had rescued Syroid from the pool and people were trying to give him CPR. Later, my Grandma had to be taken to the hospital.

4.  I remember staying with my ~~Grandma~~ dad in Pine Bluff during the summer of 1994. My father and I spent most of that summer together. We would go to movies and walk the dog. He would pick me up and take me shopping. On July 4th, we set off firecrackers and watched the fireworks together.

5.  My father keeps in touch with me through letters and phone calls. I always look forward to hearing from him. He always encourages me to do my best in sports and to work hard in school and stay out of trouble. When I'm having problems, talking to my father on the phone helps me feel better.

220

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on ___*May 4, 2002*___ .

Eric Hampton

221

Exhibit 24

Emergency room records-- Betty Hall
(Our Lady of the Lake Hospital)

222



**OUR LADY OF THE LAKE**
REGIONAL MEDICAL CENTER

Date: 5|7|01

PATIENT: Hall, Betty
DOB: 2|22|44
MRN: 001069335

DOS: 5|15|94

To Whom It May Concern:

The enclosed copies of medical records have been copied from medical charts whose microfilmed or microfiched quality has become substandard. We cannot assure legibility.

If I can be of further assistance, please feel free to contact me at (225) 765-7750.

Sincerely,

Yvette Francois
Release of Information Supervisor
Health Information Management Department

5000 Hennessy Boulevard · Baton Rouge · Louisiana 70808-4398 · Phone 225-765-6565

Sponsored by the Franciscan Missionaries of Our Lady / A Health Care Affiliate of VHA, Inc.

20721(8/96)

223



**OUR LADY OF THE LAKE**
REGIONAL MEDICAL CENTER
TO: _Maria A. Widder_

CONFIDENTIAL

## RELEASE OF INFORMATION
## CUSTOMER SATISFACTION SURVEY

PATIENT NAME: _Hall, Betty_

MEDICAL RECORD NO: _001069335_

YOUR COMMENTS:

Returning did not request records    [  ]    _____

Records complete, accurate, legible  [  ]    _____

Records received in timely order     [  ]    _____

Returning all records unacceptable   [  ]    _____

OVER ALL QUALITY OF RECORDS
  EXCELLENT ___   GOOD ___   POOR ___   NEED SERIOUS IMPROVEMENT ___

Processed By: _APRIL ADLER_          Date: _5|7|01_

PLEASE RETURN TO:

OUR LADY OF THE LAKE MEDICAL RECORD DEPT
ATTN: YVETTE FRANCOIS, ROI SUPERVISOR
5000 HENNESSY BLVD
BATON ROUGE, LA 70808

224

EMERGENCY    OUR LADY-OF-THE LAKE REGIONAL MEDICAL CENTER    BATON ROUGE, LA. 70806

MODE: ☐ AMB ☐ AMBULATORY ☐ WHEEL CHAIR ☐ STRETCHER ☐ CRUTCHES    ACCOM BY:    PO:    ☐ NO    ☐ YES    TRANSFER

**TRIAGE NOTE**

TIME:    TRIAGER'S SIGNATURE

ALLERGIES NKA    TETANUS TOXOID

ADMISSION VITAL SIGNS:    TEMP: 98    ☐ ORAL ☐ RECTAL    PULSE 68    RESP: 20    B.P.: 140/92

**NURSES ADMISSION HISTORY & ASSESSMENT**

TIME: 1140 Report of "seizure" by EMT & son. Son states "she was twitching all over & foaming @ the mouth. Arrived via EMS — mildly drowsy, loose muscled, c short attention span & foam on lips. ☐ c side weaker than left. D5W @ 30cc/hr to ☐ hand

Hx: Stroke 4/1993, HTN, Blood clots, Aneurysms – Both by [illeg]    NOTIFICATION OF:    ☐ POLICE    ☐ CORONER    ☐ CLERGY

Meds "B/P"    NURSE'S SIGNATURE

**LAB, X-RAY, EKG & OTHER ORDERS**

CT [illeg] plain, [illeg]

1150 A&O x3. Speech clear & appropriate. R side still weaker than ☐ but much improved

**PHYSICIAN'S REPORT**

FACE SHEET

1210 A&O drowsy, per RTT — mfn

1239 [illeg] Ativan IV in 1 cc seven BiU p 1 min

1238 Return from CT. loudly calling for grandbaby DH

**NURSES NOTES**

410 IV DC pressure applied - cath tip intact ☐ redness or swelling noted

To P 138/90 P — 72 R-18 stato [illeg] better.

36 34

☐ GIVEN BY SEPARATE SHEET    DIAGNOSIS: [illeg]

**PATIENT NOTIFICATION**

PATIENT SIGNATURE    PHYSICIAN'S SIGNATURE    DATE:

DOES PATIENT HAVE AN A/D?    COPY PROVIDED?    WRITTEN INFO. GIVEN?    COMMENTS:
☐ Y  ☒ N  ☐ N/A    ☐ Y  ☒ N    ☐ Y  ☐ N    PATIENT DOES NOT HAVE ADVANCE DIRECTIVE

| PATIENT ACCOUNT NO. | REGISTRATION DATE | REGISTRATION TIME | REGISTERED BY | PT. TYPE | DISCHARGE | | MEDICAL RECORDS NUMBER |
|---|---|---|---|---|---|---|---|
| 0106 9335-4135 | 05/15/94 | 11·40A | JT | E | TIME 1415 ☐AM ☒PM | | 0000000 |

| FIN CL. | DOCTOR NBR. | DOCTOR NAME | TIME PAGED | TIME NOTIFIED | INPATIENT ADMIT ☐AM ☐PM ROOM |
|---|---|---|---|---|---|
| P | 11111 | Calloway (Arkomoi) | | | TIME ____ |

DOCTOR NBR    DOCTOR NAME    TIME PAGED    TIME NOTIFIED

CONDITION: ☐ POOR ☐ FAIR ☐ STABLE ☐ GOOD ☒ IMPROVED
MODE: ☐ AMB ☐ AMBULATORY ☐ WHEEL CHAIR ☐ STRETCHER ☐ CRUTCHES

| DATE | SEX-MARITAL STATUS | P.E.G. | RELIGION | CLOTHING | | VALUABLES |
|---|---|---|---|---|---|---|
| 02/22/44 | 50Y F M | R | 590 | Ept | | NEU |

| | PATIENT | | | GUARANTOR | |
|---|---|---|---|---|---|
| NAME | HALL, BETTY | | NAME | HALL, BETTY | |
| STREET | 1305 N. QUAKER | | STREET | 1305 N. QUAKER | |
| CITY, STATE, ZIP | EL DORADO    AK 71730 | | CITY, STATE, ZIP | EL DORADO    AK 71730 | |
| TELEPHONE | 501/862-3177    SS. NBR. 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 | | TELEPHONE | 501/862-3177    SS. NBR. 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 | |

| | NEAREST RELATIVE | | | EMPLOYER | |
|---|---|---|---|---|---|
| NAME | HALL, A.J. | | NAME | QUAKER | |
| STREET | 1305 N. QUAKER | | STREET | | |
| CITY, STATE, ZIP | EL DORADO    AK 71730 | | CITY, STATE, ZIP | EL DORADO    AR | |
| TELEPHONE | 501/862-3177    RELATIONSHIP H | | | | |

INSURER

225

E.C.U NUR... NOTES

NAME: Hall, Betty

E.C.U. NO. _____

DATE: 5-15-91

ALLERGIES: _____

| TIME | MEDICATION, IV & TREATMENT | NOTES |
|------|----------------------------|-------|
| 1415 | | DC instructions reviewed c̄ pt she repeated + verbalized understanding written copy given — mrs |
| | | |

N8-64 (2)

226

## OUR LADY OF THE LAKE REGIONAL MEDICAL CENTER
### BATON ROUGE, LOUISIANA

| PATIENT NAME: Hall, Betty | ECU NO. 0100335-4135 | ADMIT DATE 5-15-94 |
|---|---|---|

### EMERGENCY CARE UNIT DISCHARGE INSTRUCTIONS

☐ YOU HAVE BEEN TREATED BY YOUR PRIVATE PHYSICIAN OR CONSULTING PHYSICIAN.
☑ YOU HAVE BEEN TREATED BY AN EMERGENCY PHYSICIAN. THE EXAMINATION AND TREATMENT WHICH YOU HAVE RECEIVED HAS BEEN ON AN EMERGENCY BASIS ONLY AND HAS NOT BEEN INTENDED TO BE A SUBSTITUTE OR REPLACEMENT FOR COMPLETE MEDICAL CARE.

DR. _Kerry_ . HAS TREATED YOUR EMERGENCY PROBLEM.

### PATIENT INSTRUCTIONS

☐ A. For follow-up care, call and make an appointment with your family doctor.
☑ B. You are referred to your private physician or the following physician. Please make an appointment for follow-up treatment.

Dr. _Colloway_ Phone _____

☐ C. X-RAYS will be initially reviewed by Emergency Physician or your private doctor. They may be referred to a radiologist for immediate interpretation or will be read by the radiologist the following day for a final interpretation.

### FOLLOW INSTRUCTIONS MARKED BELOW

#### MEDICATIONS

☑ The medications you received may cause drowsiness or dizziness.

☐ Take medications as ordered per physician.

#### WOUND CARE (Cuts, Scratches, Animal Bites, Sutures, Etc.)

☐ Keep dressing intact, clean, dry for _____ days.
☐ Do not remove dressing.
☐ Wound may be left open after original dressing is removed.
☐ If wound becomes red, swollen, shows pus or red streaks, feels more sore instead of less sore, report to your doctor.
☐ If tetanus (lock jaw) immunization given, keep record of date.
☐ Stitches must be removed in _____ days.
☐ Animal bites: Contact police for instructions.

#### ☐ HEAD INJURIES

Rest for next 24 hours.

Liquid diet 24 hours.

CHECK PATIENT HOURLY (WAKE UP TO MAKE SURE HE/SHE KNOWS NAME/DATE/WHERE HE IS) UNTIL YOUR PHYSICIAN TELLS YOU TO STOP. BRING PATIENT BACK TO EMERGENCY ROOM OR CONSULT YOUR OWN DOCTOR IMMEDIATELY, IF:

1) A large, soft lump on head
2) Unusual drowsiness (cannot be awakened)
3) Forceful or repeated vomiting
4) Clumsy walking
5) Fit or convulsion (jerking or spells)
6) Bad headache
7) One pupil larger than other
8) Weakness of an arm or leg
9) Dizziness
10) Blurred vision
11) Unusual irritability or restlessness
12) Clear or bloody drainage from ear.

#### EYE INJURY OR FOREIGN BODY

☐ Leave patch in place for _____ hours. Your eye patch will hinder your depth perception. Do not drive with eye patched.

☐ Call your doctor if increased pain, redness or discharge develop.

#### CAST CARE

☐ Elevate above heart level to decrease swelling.
Do not get cast wet or soiled.
Do not put objects between cast and skin.
If the part gets cold, blue or numb, or if pain increases markedly, have it checked promptly.
☐ Cast will not be completely dry for 48 hours.

#### FEVER CONTROL

☐ Give patient plenty of fluids.
Do not use heavy clothes or covers unless the patient is chilling.
Keep room temperature at a normal level.
Keep child quiet.
Take temperature orally or rectally every 3-4 hours.
☐ Aspirin substitutes (Tylenol, etc.) may be used every 4 hours if temperature is over 100 degrees (orally). Dosage is on the medicine bottle.
☐ Sponge baths using lukewarm water may be helpful if the temperature is over 102. The patient should be sponged for 20 minutes or until chilling develops. Dry patient and put in light clothes. Recheck temperature 30 minutes after bath was finished. You may repeat bath as needed.
☐ Call your Doctor if you are unable to get fever down, if fever lasts over 48-72 hours, or if new symptoms develop.

#### ☐ DIARRHEA & VOMITING

Give frequent small amounts of clear liquids (water, tea, gingerale, Jello, pedialyte solution, Seven-Up, Kool-Aid). Avoid milk or milk products for 24 hours. Consult your Doctor if the patient:

1) Is getting weak
2) Has difficulty breathing
3) Has fever over 103°
4) Has no tears when crying (Baby)
5) Urine output decreases (wetting less)
6) Continuous vomiting
7) Continued frequent diarrhea

#### ☐ SPRAIN, FRACTURE OR SEVERE BRUISE

Elevate above heart level to lessen swelling.
Remove rings, watches, etc. on injured extremity.
Ice packs prevent swelling, especially during first 24-48 hours. Place ice in rubber or plastic bag; cover with cloth.
If the part gets cold, blue or numb, or if pain increases markedly, have checked promptly.
☐ Rewrap your elastic bandage if too tight or loose.
☐ Do not bear weight on injured extremity.

#### ☐ HIGH BLOOD PRESSURE

Your blood pressure was found to be higher than normal. Please see your physician for a check-up.

☑ Special Instructions: _Motrin x 4 hours - follow up with doctor in Arkansas_

I have been advised and understand the instructions indicated above. I will arrange for follow-up care as recommended.

X _Betty Hall_
Patient or Responsible Signature

_M. Dirby, M.D._
Name

5-15-94

### MEDICAL RECORDS

227

MREC -5883        O L O L    CLINICAL INFORMATION SYSTEM        PAGE 001
RJKY SD RAD   ECU

PRINT DATE: 05/15/94  13:44   CHART COPY   QAIRLR

HALL, BETTY                         SEX: F   AGE:  50          RADIOLOGY
01069335-4135                       ADM DATE: 05/15/94          RESULT
ECU          -                      DOB     : 02/22/44
ATN MD: -                                                  PERMANENT CHART COPY

ORDERING MD: KERRY, DR. ROBERT M.
EXAM:  CT HEAD W/O CONTRAST                                            1.01
RADIOLOGIST: WALKER, DAVID W
EXAM DATE: 05/15/94 12:40

CT BRAIN WITHOUT CONTRAST, 05/15/94:

VENTRICLES ARE NORMAL IN SIZE, SHAPE, AND POSITION. NO INFARCT,
MASS, INTRACEREBRAL HEMORRHAGE, OR SUBDURAL COLLECTION SEEN. THERE
IS MUCOSAL THICKENING INVOLVING THE SPHENOID SINUS.

IMPRESSION:

1. NO INTRACRANIAL ABNORMALITY.

2. MUCOSAL THICKENING SPHENOID SINUS.

INTERPRETER: DAVID W. WALKER

81A-051594

                              LAST PAGE

HALL, BETTY                     01069335              RADIOLOGY RESULT   11

228



OUR LADY OF THE LAKE REGIONAL MEDICAL CENTER
5000 HENNESSY BLVD.
BATON ROUGE, LOUISIANA 70808

cc:    Coastal Emergency Physicians

HALL, BETTY
Patient Number:    01069339-4135
Admitted:    05/15/94
Room Number:    ECU
ROBERT KERRY, M.D.

## EMERGENCY CARE UNIT NOTE

Date:   05/15/94

**CHIEF COMPLAINT:** Possible seizure.

**HISTORY OF PRESENT ILLNESS:** The patient is a 50 year old lady who comes to the emergency room for evaluation. She arrived by ambulance. It was noted that she may have had a seizure. She did get very upset. She had to witness the resuscitation of her grandchild at a local hotel where he was a near drowning victim. Fortunately, he was resuscitated, but, needless to say, it caused quite a bit of stress with several people, including Ms. Betty Hall. She was anxious, started crying, and then had a period that was described as a seizure with her jerking her arms and legs. She was transferred to the hospital. No anti-convulsant was given.

**CURRENT MEDICATIONS:** She is on blood pressure medicine.

**PAST MEDICAL HISTORY:** She has a history of stroke in 1993, hypertension, aneurysm, and blood clots.

PHYSICAL EXAMINATION
VITAL SIGNS: Blood Pressure: On arrival, 140/94.
GENERAL: This is an alert, attentive, crying, and obviously grieving patient.
EYES: Equal, round, and reactive to light.
EARS: Tympanic membranes are gray.
NECK: Supple. No stiffness. She denies a headache.
CHEST: Clear.
HEART: Regular rhythm without ectopy.
ABDOMEN: Protuberant and soft.
EXTREMITIES: Normal.

**DIAGNOSTIC STUDIES:** Blood gases obtained are normal. CT of the head is normal.

**IMPRESSION:** Grief reaction.

**PLAN:** Ativan 2mg IV was given. I would _____ that the patient try to rest. She has been given the news that the grandson is doing well, although he will be admitted to the hospital. She is to followup with her physician, Dr. Calloway, in Arkansas.

ROBERT KERRY, M.D.

dd: 05/15/94
dt: 05/18/94
RK:dd-EMTA-8534

229

OUR LADY OF THE LAKE REGIONAL MEDICAL CENTER
Cumulative Blood Gas Results

RESPIRATORY SERVICES

CLAY A. WAGGENSPACK, M.D.
MEDICAL DIRECTOR, BLOOD GAS LABORATORY

Page: 1

Name: HALL, BETTY
Acct: 010693354135
Room:

Admit Date:
DOB/Age: 02/22/44

Attending Doctor: 11111
Sex: F

## BLOOD GASES - ARTERIAL

| | O2SAT | PH | PCO2 | PO2 | HCO3 | CO2CT | B.E. | MODE/DEVICE | FLOW | FIO2 | RR | TV | PEEP | PIP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UNITS | % | NONE | MMHG | MMHG | MMOL/L | MMOL/L | MMOL/L | NONE | LPM | % | BPM | ML | CMH2O | CMH2O |
| HIGH NORM | 100.0 | 7.450 | 45.0 | 100.0 | 26.0 | 27.0 | +2.0 | | | | | | | |
| LOW NORM | 95.0 | 7.350 | 35.0 | 80.0 | 22.0 | 23.0 | -2.0 | | | | | | | |
| 05/15 12:20 | | 7.390 | 35.3 | 82.9 | 22.5 | 22.4 | -2.4 | /R/A | 0 | 21.0 | 0 | 0 | 0.0 | |
| 05/15 12:20 | | 7.390 | 35.3 | 82.9 | 22.5 | 22.4 | -2.4 | /R/A | 0 | 21.0 | 0 | 0 | 0.0 | |

230

MREC -5894                O L O L   CLINICAL INFORMATION SYSTEM
PRINT DATE: 05/15/94  14:46    CHART COPY  QA7DIS                 PAGE 001

HALL, BETTY                      SEX: F AGE:   50        MEDICATION
01069335-4135                    ADM DATE: 05/15/94      SUMMARY.
ERDE        -                    DOB      : 02/22/44
ATN MD: KERRY, ROBERT M.                                PERMANENT CHART COPY

MEDICATION ALLERGIES
    NONE RECORDED

                                         LAST PAGE

HALL, BETTY                        01069335                      MED SUMMARY  1

MRECT-6619          0 % 0 L    CLINICAL INFORMATION SYSTEM

PAGE 001

PRINT DATE: 05/16/94  03:03   CHART COPY   QAMPES

NURSING/ANCILLARY NOTES
DISCHARGE REPORT

HALL, BETTY                        SEX: F AGE:   50
01069335-4135                      ADM DATE: 05/15/94
ERDEP        -                     DOB      : 02/22/44        -PERMANENT CHART COPY-
ATN MD: KERRY, ROBERT M.

SUMMARY: 05/15 00:00 TO 00:00 05/16

PATIENT INFORMATION:
  05/15 11:43   CHIEF COMPLAINT:X                                        4334

ERDEP:   14:15 05/15/94

USER NAMES AND INITIALS

R111114334

LAST PAGE

HALL, BETTY                     01069335                    DISCHARGE REPORT

232

MRECX-6618          O L O L     CLINICAL INFORMATION SYSTEM

PAGE 001

PRINT DATE: 05/16/94  03:03   CHART COPY   QAVPRG

HALL, BETTY                          SEX: F AGE:   50          DISCHARGE REPORT
01069335-4135                        ADM DATE: 05/15/94         PHYSICIAN ORDERS
ERDEP        -                       DOB     : 02/22/44     -PERMANENT CHART COPY-
ATN MD: KERRY, ROBERT M.

SUMMARY: 05/15 00:00 TO 00:00 05/16

ERDEP:   14:15 05/15/94

NEW ORDERS ENTERED FOR THE DAY:

05/15/94   12:01
       1 X-RAY: CT HEAD W/O CONTRAST, SCHEDULE: STAT (CRITICAL),
         HANDLING: STRETCHER --ER16  (RJKY)
ENTERED BY: WIRE,BONNIE A.              ENTERED FOR: KERRY, DR. ROBERT M.

05/15/94   12:02
       2 ARTERIAL BLOOD GASES, STAT, (RJKY)
ENTERED BY: WIRE,BONNIE A.              ENTERED FOR: KERRY, DR. ROBERT M.

05/15/94   14:03
       3 ARTERIAL BLOOD GAS ANALYSIS, , STAT, 01669015, (RJKY)
ENTERED BY: LIS-                        ENTERED FOR: ROBERT J. KERRY, M.D.

05/15/94   14:46
       4 ARTERIAL BLOOD GASES, STAT, (RJKY) (AUTO DC @ DISCHARGE)
       5 ARTERIAL BLOOD GAS ANALYSIS, , STAT, 01669015, (RJKY) (AUTO DC
         @ DISCHARGE)
ENTERED BY: R111144652                  --COMPUTER-CODE SIGNATURE--
                    THERE WERE NO ORDERS HELD TODAY
                    NO ORDERS WERE COUNTERSIGNED TODAY

                              LAST PAGE

HALL, BETTY                    01069335                    DISCHARGE REPORT

233

MRECL-7452          0 1 0 1  CLINICAL INFORMATION SYSTEM                PAGE 001

PRINT DATE: 05/17/94  04:02  CHART COPY  QADPRG

RESULTS
SUPPLEMENTARY REPORT

HALL, BETTY                    SEX: F AGE:  50
01069335-4135                 ADM DATE: 05/15/94          -PERMANENT CHART COPY-
ERDEP                         DOB     : 02/22/44
ATN MD: KERRY, ROBERT M.

SUMMARY: 05/16 00:00 TO 00:00 05/17

LAB RESULTS:                              SPEC'M 05/15 12:15
                                         ART.BLOOD GAS

(7.350-7.450)     PH ................ 7.390  .
(35.0-45.0)       PCO2 ............. 35.3    MMHG
(80.0-100.0)      PO2 .............. 82.9    MMHG
(22.0-26.0)       HCO3 ............. 22.5    MMOL/L
(21.0-27.0)       CO2 CONTENT ...... 22.4   MMOL/L
(-2.0-+2.0)       BASE EXCESS ...... -2.4   MMOL/L
                  . ................ . .
                  .. ............... .
                  MODE/DEVICE ...... ROOM AIR
                  INSPIRED O2 ...... 21      %
                  ... ............... .
                  DRAW SITE ........ RIGHT RADIAL
                  TECH/TECH ........ 173     .

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LAST PAGE

==================================================================================

HALL, BETTY                    01069335                    DISCHARGE REPORT

234

MRECX-7451          O L O L     CLINICAL INFORMATION SYSTEM               PAGE 001

PRINT DATE: 05/17/94  04:02   CHART COPY   QADPRS

HALL, BETTY                    SEX: F  AGE:   50          SUPPLEMENTARY REPORT
01069335-4135                  ADM DATE: 05/15/94             PHYSICIAN ORDERS
ERDEP          --              DOB     : 02/22/44         -PERMANENT CHART COPY-
ATN MD: KERRY, ROBERT M.

SUMMARY: 05/16 00:00 TO 00:00 05/17

ERDEP:   14:15 05/15/94

NEW ORDERS ENTERED FOR THE DAY:

05/16/94   15:27
        6 ARTERIAL BLOOD GAS ANALYSIS, , TODAY, 01669939, (05/16/94),
        (ERPY)
ENTERED BY: LIS-                       ENTERED FOR: - , M.D.
            THERE WERE NO ORDERS HELD TODAY
            NO ORDERS WERE COUNTERSIGNED TODAY

                        LAST PAGE

HALL, BETTY                    01069335                        DISCHARGE REPORT
-W-

235

ERDEP-0605        O L O L    CLINICAL INFORMATION SYSTEM
·ERPY RH RESP ERDE      5000 HENNESSY BLVD-BATON ROUGE,LA 70808    PAGE 001

PRINT DATE: 05/16/94  15:30        QARBLR

HALL, BETTY                    SEX: F   AGE:  50
01069335-4135                  ADM DATE: 05/15/94        RESPIRATORY
ERDE       -                   DOB    : 02/22/44        BLOOD GAS RESULT
ATN MD: KERRY, ROBERT M.

ORDERING MD: - , M.D.

                              SPECIN 05/15/94   12:15        ORD#    6.01
          NORMAL RANGE              ART.BLOOD GAS
        (7.350-7.450)    PH................... 7.390   .
        (35.0-45.0)      PCO2............... 35.3   MMHG
        (80.0-100.0)     PO2............... 82.9   MMHG
        (22.0-26.0)      HCO3............... 22.5   MMOL/L
        (23.0-27.0)      CO2 CONTENT....... 22.4   MMOL/L
        (-2.0-+2.0)      BASE EXCESS...... -2.4   MMOL/L
                         .................. .  .
                         MODE/DEVICE...... ROOM AIR
                         INSPIRED O2...... 21    %
                         .................. .
                         DRAW SITE........ RIGHT RADIAL
                         THER/TECH........ 173   .

                              LAST PAGE

HALL, BETTY                                      BLOOD GAS RESULT  15

Exhibit 25

Declaration of A.J. Hall

237

DECLARATION OF A. J. HALL

A. J. Hall, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is A.J. Hall. I live at 521 Kearing Avenue in El Dorado, Arkansas.

2. Orlando Hall is my son. We have always called him "Lan."

3. I was born on January 7, 1928, in Louisiana. I am seventy-four years old. I was the youngest of the eleven children -- nine boys and two girls -- in our family.

4. When I was very young, my father Thomas Hall was a sharecropper. We had a garden, and we grew corn and raised hogs and chickens. My job was to usually to wash the dishes, clean the kitchen, and fetch wood. I also helped with the animals. My Dad eventually stopped working as a sharecropper and retired. Other members of our family worked to support the family.

5. When my older brothers and sisters were young, my father had worked on the railroad, and was gone during the week for days at a time. He was very strict, and would punish us severely if we didn't do what we were supposed to do, like getting home before dark or doing our chores. The same thing would happen if we didn't go to church or to school.

6. I went to elementary school in Lisbon, Louisiana, and later to high school in Homer, Louisiana. I had average grades. I did have some problems sometimes with remembering or understanding things. I was always on the go -- I couldn't sit still. I guess you could say I was easily distracted. Lan was the same way and his daughter Te'Aushia is, too.

7. I joined the U.S. Army in 1946. I actually went into the military before I finished high school. I served for nineteen months. I did my basic training in Mississippi, and then

went to California and later to the Philippines. I loved it there, because it was warm. This was in peacetime and they were letting people out from the service early. Later, during the Korean War, they tried to get me to reinlist, but I stayed out. I did some drinking in the Army, on the weekends when it didn't interfere with my work. Mostly I drank beer and whiskey. I received an honorable discharge.

8. When I came back to the U.S., I finished high school at Homer High School. I graduated in 1948, when I was twenty years old.

9. Around that same time, I married for the first time. I had known Fannie Mae when I was in the service, and I married her after I got out. She was sixteen years old and I was twenty. Our marriage only lasted a year or so and we split up in about 1949. While we were married, we had a son, Alvin James, Jr. I had another son by a different woman, Classie Moore, but I didn't marry her.

10. After Fannie Mae and I split up, I moved to Dallas and worked for a while in construction. I came to El Dorado in 1952, and started to work at Southern Folders, a company that made paper office products. I worked there off and on for thirty-six years. Sometimes I would quit and go work somewhere else, but I always went back to Southern Folders. Since 1952, I have lived continuously in El Dorado.

11. In 1952, I met Geraldine, my second wife. We married in July, 1952 and were together for ten years. She had never been married. Our marriage became rocky when I became involved with another woman. My affair with this woman lasted for a couple of years and it got me in big trouble with Geraldine when Geraldine found out about it. We finally just split up in 1962, and she went away to Chicago. She filed for divorce from me that same year. She never married again and never had any children. She passed

239

away a couple of years ago, and I went to her funeral.

12. While I was with Geraldine, I also had an affair with a woman named Vera. Geraldine didn't find out about that relationship until after she and I had split up. I was with Vera for a couple of years, and we had two sons together, Keith and Paul. We fell to arguing, though, because while I was with Vera, I met Betty. I was attracted to Betty and Vera knew it. We ended up splitting up.

13. Betty already had her daughter Pam when I met her. Betty was attractive and I thought it was finally time to settle down and quit messing around. We went together for a good while before we got married. We finally got married in April of 1966. Our daughter Cassandra was born in December of 1966.

14. When I first met Betty, she wasn't working at the chicken plant in El Dorado yet. She started there sometime before Cassandra was born. Our son Scotty was born in 1967, and Lan in 1971. Each time we had another child, Betty would be right back at work two or three months after giving birth. Since I was still working full-time, members of our family would help take care of the kids.

15. Betty's health was not always good. At one time in the early 1970's, she had problems with her head and had to go into the old Walter Brown Hospital here in El Dorado. She was in and out of the hospital for weeks. There were times we thought she wouldn't make it. We had known a man whose wife had the same condition as Betty, and she had surgery for it and died. I do not know if she had a tumor, but she had something in her head. A couple of years later, in 1973 or 1974, Betty had to have surgery for cancer. She was at Union Hospital that time, for fifteen days or so. She had to have two surgeries because they didn't get all the cancer the first time.

2480

16. Lan had some health problems when he was small, too. He had high fevers because he had an ear problem that flared up from time to time. He ended up having tubes put in his ears to drain out the fluid. I remember one time we took him and Tracy to the hospital because both of them were running high fevers; the doctors put them both into cold water to bring down the fever.

17. When he was younger, Lan sometimes talked about how much he struggled in school. I knew he found things hard and had trouble understanding what he read. Pam had a speech problem and Demetrius also had serious problems in school. I think all of them were in special remedial classes.

18. My marriage to Betty was stormy. We fought and argued. Sometimes she would leave the house to play cards and she would not come back until late in the night. That would upset me, and I often started a fight. Then other times I would stay out playing dominoes until even late, and we'd argue about that. When we argued, one thing would lead to another. We would start out hollering or screaming and things would get worse from there. Sometimes I slapped her with my open hand, but I also hit her with my fists. I would just lose control and go too far, and would not really realize it until after I had beat her. There were times when I beat her that she was physically hurt. I felt bad about it afterwards, sometimes, and I feel even worse about it now. I hit her in front of the children. I know they saw what happened, and I am ashamed now to realize how much it must have frightened them to see us fighting or hear us screaming at one another, and to see or hear their mother being hit. My father never hit my mother, but I have fought with all the women in my life. I fought with Geraldine and sometimes it got physical, and the same thing happened with Vera.

2-41

19. Although I did not drink every day, I sometimes had too much to drink on the weekends. It was usually when I was drinking heavily that I could "lose it" if I got angry or upset. Sometimes I "lost it" and ended up hitting Betty, and sometimes I "lost it" in disciplining the kids. I know I was less able to control my anger when I was drinking.

20. I tried to discipline my kids the way I was disciplined when I was little. I used a switch, mostly, although sometimes I used my belt. I know Scotty preferred being whupped with a belt. Sometimes if I knew I was going to whup one of the children, I would have that child go and cut the switch for me to use. Sometimes I had one child go get the switch I would use to whup one of the other children. Betty disciplined the kids, too.

21. If one of the kids made me really angry, I knew if I went ahead and disciplined them right away, I would go too far and lose control. That's why sometimes I would wait until later to whup them, so I could keep from "losing it." Lan sometimes got so scared lying in bed waiting for me to finally come in and whup them that he would wet the bed. And then Betty would whup him for that.

22. I know that Betty suffered from problems with her nerves. She took pills that were prescribed by her doctor. At times, I believe she was depressed, because I would notice changes in her mood and behavior. She had two car accidents that I thought might be connected to her taking medication for her headaches and nerves. I also believe she may have a problem with gambling. She played cards for money in the past, and she was always very serious about it. You could say she's addicted to cards.

23. Betty packed up and left in 1988. I didn't try to stop her. I figured she had her mind made up. I was tired of the arguments. We had talked and talked, and our situation wasn't getting any better. Powell, the man she was involved with after leaving me, was a

242

drunk. He was in a bar or drunk whenever you saw him. Betty was not a drinker, however, so it surprised me that she would be with someone like Powell. The last time Betty had a drink was before Lan was born.

24. I didn't know that Betty left the boys -- Lan, Tracy, and Demetrius -- to fend for themselves. I felt it was best to stay away from the house where they were living, in case Betty came around and didn't want me there. Instead, they came up to visit me on Kearing Ave. Demetrius even came here and lived with me at one point. I am sorry I never checked on them to know that they did not have food in the house or that the electricity was turned off.

25. Betty filed for divorce from me in 1989. It turned out that the final divorce decree in my marriage to Geraldine was not entered until 1967, so when Betty and I got married in 1966, our marriage was not legal. For that reason, Betty's divorce complaint was dismissed.

26. I know that Orlando and Tracy got caught up in dealing drugs. My son Scotty had a drug problem of his own -- he was a drug addict. I think it started when he was in the military. He is in jail now but will be released sometime this year. He tells me that he wants to stay away from El Dorado and try to keep away from the people he used to use drugs with, so he can keep from using drugs again.

27. I know that Lan wanted to get away from the drugs. He talked to me about it. He sent LaTonya to Dallas to get a job, and he planned to move there and get a job himself. His life was causing him so much stress that his hair was turning gray. He wanted to change his life for the better.

28. Mike Ware, who was one of Lan's attorneys, came to El Dorado before the trial. We

293

talked for a little while, and I remember he asked me if I would testify for Lan. At some point, a woman working for Lan's attorneys also came and talked to me. I do not remember how long we talked, but it was not a real long conversation.

29. I went to Fort Worth, Texas, for Lan's trial. I remember talking to his attorneys there. We were all in a room together -- the attorneys, my ex-wife Betty, Willie Ray Norful, my daughter Cassandra Ross, and maybe a couple of other people. We discussed Lan's upbringing, but I did not tell them many of the things I have included in this statement.

30. It is difficult to talk about many of these things that happened in my marriage to Betty, and my feelings about them. I love my children but I am ashamed of some of the things I did to them and their mother in the past. I even called Betty once to try and apologize for how I treated her all those years. I go to church regularly now and pray that God will forgive me for the sins I committed against my family. At the time of Lan's trial, I needed more time to be able to talk about these things, especially in front of strangers. The time I have spent with Jill Miller has helped me trust her and Lan's current lawyers in a way that I could not at the time of Lan's trial, because things were just moving too fast. I feel that if Lan's lawyers in 1995 had spent the same amount of time helping me to understand why it was so important to tell the painful truth about my marriage to Betty and how I treated her and our children, I could have done so at Lan's trial.

31. I did not hear from anyone connected with Lan's defense after the trial, until his current lawyers Marcy Widder and Rob Owen came to El Dorado and met with me.

32. Lan still calls me on the telephone and sends me greeting cards. I know he keeps in touch with the whole family. His love and support are especially important to his children.

244

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___6—3-02___ (date).

A. J. HALL

245

**Exhibit 26**

Declaration of Rev. Jerry Ross

246

## DECLARATION OF JERRY ROSS

Jerry Ross, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is Jerry Ross. I reside at 1015 Short West 2nd St. in El Dorado, Arkansas. I am pastor of the Hosanna Baptist Church.

2. With my wife Gracie and our son Jerry, I lived from about 1968 to 1981 on Kearing Street here in El Dorado. A.J. and Betty Hall, along with their children, lived on the same street during that period, about two doors down from us.

2. The relationship between A.J. and Betty was pretty turbulent and everyone in the neighborhood was aware that there was a lot of violence between them.

3. One reason I was aware of the frequently violent nature of A.J. and Betty's marriage was because they often fought in the yard in front of their house, where everyone in the neighborhood could hear and see clearly what was going on. They apparently would start fighting inside, and then take it out in the yard, usually when Betty was trying to leave and get away from A.J. They would yell and scream and curse at one another and A.J. would sometimes hit Betty with his fists. When these fights occurred, the Hall children were always right there watching, even when they were very small.

4. Another reason that Gracie and I knew that Betty was beaten by A.J. was because we saw her in the neighborhood just about every day, and she very often had bruises on her face. Sometimes her eyes were blackened and swollen.

5. Orlando Hall's older sister Cassandra eventually married our son Jerry. Orlando lived with them for a while down in Texas. When we visited their family, or when Orlando visited with us here in El Dorado, I was always impressed by how well-mannered and polite Orlando was. He would say "Sir" and "Ma'am" when he spoke to an adult, and

247

he was very good with our young grandson Marco. Orlando and Marco would play basketball together, and sometimes Orlando was responsible for taking care of Marco.

6. Before April, 2000, I was never contacted by anyone, before or after Orlando Hall's trial, concerning my familiarity with his family. If I had been asked, I would have told them the same things I have stated in this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __May 9th 2000__ (date).

Rev. Jerry Ross

REV. JERRY ROSS

248

Exhibit 27

Declaration of Gracie Ross

249

## DECLARATION OF GRACIE ROSS

Gracie Ross, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1.  My name is Gracie Ross. I reside at 1015 Short West 2nd St. in El Dorado, Arkansas

2.  With my husband Jerry and our son (also named Jerry), I lived from about 1968 to 1981 on Kearing Street in El Dorado. A.J. and Betty Hall, along with their children, lived about two doors down on the same street during that same time.

2.  I would describe A.J. and Betty's relationship as frequently unhappy and marked by violence. This was no secret. A.J. and Betty fought a lot, and often did so in front of their house, just a few yards away from where we were living. We could, and did, see and hear most of what went on. It seemed that the fights would start inside the house, and then they would kind of spill outside into the yard. A.J. and Betty would yell and scream and swear at one another. A.J. often struck Betty with his fists, right there in the yard where everyone could see. When these fights occurred, the Hall children were always right there watching, even when they were very small.

3.  I recall specifically one occasion when Betty attempted to escape during one such fight, by getting into their car and driving off. A.J. tried to prevent her from doing so by climbing right up on the hood of the car and beating on the windshield with his fists.

4.  I saw Betty in the neighborhood just about every day, and it was obvious that she was being beaten. She was usually bruised up and sometimes her eyes were swollen. This happened so frequently that it did not surprise me when I saw it. A.J. even beat Betty when she was pregnant.

5.  I know that A.J. drank, but I don't know if that had anything to do with the way he treated Betty. In my opinion, that is just the way A.J. treated women. The reason I

250

believe that is because I have spoken to Vera Thomas, who is the mother of some of A.J.'s other children, and Vera confided that A.J. used to hit her, too.

6. Orlando Hall's older sister Cassandra eventually married our son Jerry. Orlando lived with them for a while. When we visited with them, I was always impressed by how well-mannered and polite Orlando was. He treated adults with respect and was very fond of our young grandson Marco. Orlando and Marco would play basketball together, and sometimes Orlando was responsible for taking care of Marco.

7. Prior to April, 2000, I was never contacted by anyone, before or after Orlando Hall's trial, concerning my familiarity with his family. If I had been asked, I would have told them the same things I have stated in this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on $\underline{5-9-00}$ (date).

*Gracie Ross*
GRACIE ROSS

251

Exhibit 28

Declaration of Jerline Hill

252

## DECLARATION OF JERLINE HILL

Jerline Hill, pursuant to the provisions of 28 U.S.C. § 1746, makes the following declaration:

1. My name is Jerline Hill. I have lived in the same house in El Dorado, Arkansas for the last forty-five years.

2. I have known Betty Hall, who is Orlando Hall's mother, a long time. We worked together a long, long time — more than twenty years. We were in the same department doing line work at the chicken factory (J&M Poultry at the beginning) before Betty was promoted to supervisor. I also knew Betty just from seeing her in the community. Betty had the most beautiful and moving singing voice. She sang like Mahalia Jackson.

3. At work, Betty didn't talk about her marriage much, unless she had a particularly bad day, but we all knew that her home life was not good. Her husband, A.J., treated her very badly and abusively. Betty would come to work with black eyes, a swollen face. It was clear she was being beaten. Betty would become depressed and cry a lot of times. When that happened, she would go to the bathroom and then come back to the job when she had calmed down.

4. My impression was that A.J. was a jealous man and that was one reason he mistreated Betty. She didn't come to work beaten up every day. Instead, it seemed to happen periodically. I recall that Betty and A.J. busted up two or three times, but would get back together. At some point, Betty had a stroke or something, but I don't remember any details.

5. Work at the chicken factory was very hard. It's become much easier now because it's more automated. The plant opened in 1956 and, in the very beginning, most of the employees were white until they found out how hard the work was. At the time, there weren't many jobs available, outside of housework. We made about $11-$12 per week in the beginning. Things got better after the Meat Cutters Union got involved. Now some of the line workers make $8-9 per hour. I worked the line and was a steward for the union for many years. I retired from the plant in 1996.

6. It's my impression that African-American people in our community will always be last. White people in higher paying positions do the hiring and will hire whites first. In the mid to late eighties, there was not a lot of opportunity for the black kids in the community. Drugs have ruined a whole lot of homes and families, because the kids get into that business for the fast money. Of course, the parents have some responsibility for that — they can't be both parent and kid at the same time. I worked hard for my living and kept my children out of trouble. My son, Keith, who is a bit older than Betty's sons, has been a corrections officer for the State of Arkansas for years.

253

7. I never spoke to Orlando's attorneys before the trial. I certainly would have talked to them, but no one ever asked. I remember when Betty went to Texas for the trial. When she came back, she didn't talk much about it and I didn't ask.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ~~4 ~ 5 ~~ _____ (date).
5-4-02

JERLINE HILL

254

Exhibit 29

Declaration of Jamie Whiddon Garrett

255

## DECLARATION OF JAMIE WHIDDON GARRETT

Jamie Whiddon Garrett, pursuant to the provisions of 28 U.S.C. § 746, makes the following declaration:

1. My name is Jamie Whiddon Garrett and I reside in Little Rock, Arkansas.

2. I have known Orlando Hall for about twelve years. He is the father of my daughter, Te'ausha, and we both have maintained contact with him throughout the years.

3. I met Orlando at a car wash sometime around 1989. I don't believe he was in school at the time, although he may have been trying to get back in school. At the time, he was working at the Save More grocery store. We were the same age and I was still in school in Norphlet, Arkansas, and graduated that year. My impression of Orlando was that he was kind of shy and reserved.

4. Orlando and I started seeing each other and I became pregnant with our daughter, Te'ausha. Orlando was at the hospital either at the time she was born (on September 13, 1990) or right after. Orlando and I continued seeing each other after Te'ausha's birth, and even lived together for a while. The relationship had problems, though, because Orlando saw other women. I moved out when Te'ausha was six months old, but Orlando and I saw each other off and on even after that.

5. Orlando was always a very loving and supportive father. At one point, when I was living with my sister (who lived a block away from Orlando's mother), Orlando would be at my house every morning and every evening. He did everything to care for Te'ausha — changing her diapers, feeding her, bringing her clothing, diapers and shoes. Orlando financially supported our daughter until he went to prison in July 1992. Sometime in 1991, I moved to Illinois. After I returned to El Dorado in 1992, Orlando would again come to visit every day until he went to prison. After that, I would visit him in prison with Te'ausha until he got out in 1993.

6. After Orlando's release from prison, we maintained contact, although by that time I had

256

Orlando lived
in
Pine Bluff
(6)

I went to
school in (JG)
Little Rock

given birth to my son by the man I eventually married. I was going to barber school in ~~Pine Bluff,~~ where Orlando was living, and Te'ausha spent a lot of time with him in Pine Bluff. Orlando always took good care of her.

7. Orlando has been a loving and concerned father to all of his children. He never hit Te'ausha or any one of his children. They are all very important to him and he wants to know everything about them. Even now, he remains involved with all of his children to the best of his ability. Te'ausha, who cannot remember Orlando from before he went to prison, talks to him regularly now on the phone. Orlando calls at least once a week and writes 2-3 letters to Te'ausha every couple of weeks. He tells her to do well in school and keep her grades up and to be good and mind me. Te'ausha cherishes his attention, and sends her report cards, school work and pictures to him. She has visited her daddy three times in Texas and twice now that he is in Indiana.

8. Orlando's active concern with Te'ausha's education has been particularly important because Te'ausha has a learning disability and her father's encouragement helps to keep her motivated. Te'ausha was having problems at school because she couldn't sit still, was constantly moving around and was easily distracted. I took her to a psychologist in 1995, when she was in first grade, and learned that Te'Ausha had Attention Deficit Hyperactivity Disorder (ADHD). She is now on Ritalin, which makes a difference, although I don't give her the medication during the summer.

9. Legitimate work was hard to get in El Dorado. At one point Orlando went to work at the Hatchery — a part of Con Agra where they vaccinate baby chickens. He didn't work there long. He didn't have transportation and had difficulty getting back and forth. Then, he got sucked into the drug business, where he started making money and could buy clothes and cars, and attracted girls as well.

10. Orlando was always generous with his money when he had it. He would pay for his

257

mom's high utility and phone bills because she always had so many young people staying at her house. I knew how Orlando was making money and confronted him about it. He would say that he was going to look for a job and get out of the business; that once he got ahead, he wanted to move to Texas where it was easier to get good jobs. At one point, we planned to marry and move to Texas.

11. I worked at Con Agra for several months after I graduated from high school in 1989 and, after Te'ausha was born, for much of 1991. At the time, Betty Hall worked there as a supervisor. It was there that I first learned about the violent household in which Orlando grew up. Because Orlando was the father of my child, people at work would ask me about his parents' relationship. I didn't know anything because Orlando never talked about that part of his childhood, but at the chicken factory I learned that Orlando's father, A.J., was an alcoholic and used to beat Betty when they were married. I heard that A.J. had once beaten Betty with boards so severely that she had to go to the hospital.

12. At the time of Orlando's trial, I was living in a trailer in El Dorado. I recall talking to Tena Francis back in 1995. She took some photos that I had of Orlando, which she never returned, and asked me if I would testify at the trial. I told her that I would rather not testify, but certainly would if it would help Orlando. I never spoke with Orlando's attorneys and was never asked to come to the trial to testify. If I had been called, I certainly could have told the jury everything that I have stated here. I would have told the jury how much Orlando means to me and to my daughter and the positive influence he has on our lives even from prison.

I declare under penalty of perjury that the foregoing is true and correct. Executed on _____ (date).

_Jamie W. Garrett_
JAMIE WHIDDON GARRETT

258

## Exhibit 30

Declaration of Cynthia Hampton Braggs

259

## DECLARATION OF CYNTHIA HAMPTON BRAGGS

Cynthia Hampton Braggs, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is Cynthia Hampton Braggs and I live at

   726 El Dorado Ave. in El Dorado, AR .

2. I met Orlando Hall when I was in junior high school. Orlando was one year ahead of me in school and we had some of the same teachers. We have known each other well since that time.

3. Orlando is the father of my son, Eric Hampton. Eric was born when I was 13. Orlando was just about the same age. Because Orlando and I were so young when Eric was born, you could say we have all grown up together. Even at that young age, Orlando always saw Eric and spent time with him despite the fact that Orlando and I never had a real relationship.

4. Orlando was a good father. Eric spent every weekend or every other weekend with Orlando and his mother, Betty.

5. When Eric was 2, Orlando made sure that Betty bought Eric Easter presents with the Easter money she would otherwise have spent on Orlando. Orlando would always ask me what I wanted him to get Eric for Christmas and other occasions.

6. As the years went on, Orlando always continued to be a good father to my son and tried to take care of him financially. Orlando would take him places like Disney World and let him experience things that a lot of children in our community did not get a chance to do. He also bought Eric clothes and gave me money when he could.

260

He would always encourage Eric to do the right thing. Orlando was proud of being a father and he took this role very seriously.

7. Orlando would tell Eric to mind me, but he never physically disciplined Eric. Orlando probably didn't even approve of my spanking Eric. Orlando was never a violent person – I have never known him to do anything violent.

8. I knew and everyone knew that Orlando was dealing drugs. I never confronted him about where he was getting his money. Back in the late eighties and the early nineties in El Dorado, if you were a young African-American man making money, you were probably a drug dealer. Although Orlando had a nice car and other things, he did not live the "high life." He always took care of his family.

9. When crack arrived in El Dorado, it was an opportunity that many young black men found difficult to resist. There weren't many opportunities for young black men so they were easily tempted by the drug business. My brother and several of his friends ended up dealing drugs as well. If you ended up in jail just one time, it became nearly impossible to find a legitimate job after you got out.

10. After Orlando went to prison in 1994, Eric was very hurt and upset. He saw a counselor at his school because of his depression.

11. Orlando wrote a letter to Eric, in late 1994, pleading with him not to make the same mistakes he had made. The letter was very sad and it touched me because it was written with such sensitivity. When Orlando was younger, he had tried to hide his sensitive side, but he let it show for his son. Orlando wrote that he wanted Eric to do all of the things that he had never done. He wanted Eric to graduate from high school, play sports, and stay away from drugs and the drug life.

261

12. Eric suffers from learning disabilities which began to give him increasing trouble with his school work in about 1998. He was evaluated at this time, but he was not placed on any medications. He has since been placed in a lot of remedial classes, but he keeps his grades up. He will be in the 12th grade at El Dorado High School starting in the fall of 2002 and ~~is~~ was previously CB in special education classes for a speech problem and learning disabilities. Orlando and I have always been very serious about Eric's education. Eric ~~plans to~~ may CB enter the military after his high school graduation.

13. Orlando continues to stay in touch with Eric and remains an important part of his life.

I decare under the penalty of perjury that the foregoing is true and correct.

Executed on _May 4, 2002_

Cynthia Hampton Braggs